SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-03-0033-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2001-008991 |
| TRACY ALLEN HAMPTON, | ) | |
| | ) | |
| Appellant. | ) | |
| | ) | **O P I N I O N** |
| _____ | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable John Foreman, Judge

**AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel
          Capital Litigation Section
          Patricia A. Nigro, Assistant Attorney General
Attorneys for the State of Arizona

MICHAEL S. REEVES                                          Phoenix
Attorney for Tracy Allen Hampton

_____

**H U R W I T Z**, Justice

**I.**

**FACTS AND PROCEDURAL BACKGROUND**

¶1        On May 16, 2001, Department of Public Safety officers
attempted to serve a traffic ticket on Tracy Allen Hampton.[1]  The
officers went to a house on East Roberts Road in Phoenix, where

_____

[1]     The facts are stated in the light most favorable to
sustaining the verdicts below. *See State v. Murdaugh*, 209 Ariz.
19, 23 ¶ 2 n.1, 97 P.3d 844, 848 n.1 (2004).

Hampton had been staying with Charles Findley and Findley's girlfriend, Tanya Ramsdell, who was five months pregnant. Hampton was not there, but Findley and Ramsdell were. To prove that he was not the man the officers were looking for, Findley showed them a photograph of Hampton, and the officers left.

¶2        Early the next day, Misty Ross and Shaun Geeslin went to the house on East Roberts Road. Hampton let them in; he told them of the police visit and his intention to confront Findley about the incident. When Findley awoke, Hampton argued with him.

¶3        Later during the morning of May 17, Hampton, Findley, Ross, Geeslin and several others smoked methamphetamine. Sometime after 10:30 a.m., Hampton and Geeslin left. The two returned near noon and entered a back room where Findley was kneeling on the floor working on a lighter. Hampton turned on a CD player to a loud volume, walked in front of Findley, and called out his name. As Findley looked up, Hampton shot him in the forehead, killing him. Geeslin and Ross then walked to the front door.

¶4        Hampton began following Ross and Geeslin, but stopped and said something like, "Wait, we have one more." He then went to a bedroom where Ramsdell was sleeping and opened the door. Ramsdell told Hampton to get out, and Hampton shot her in the head. Ramsdell and her unborn child died as a result.

¶5      Hampton then joined Ross and Geeslin in Geeslin's truck.  After asking whether he had any blood on his face, Hampton asked to be taken to get some food.  A few hours later, Hampton asked Ross whether she wanted to play a game of darts and commented, "What, I killed two people, and we can't kick it?"

¶6      Hampton was arrested on May 31, 2001.  While awaiting trial in the Maricopa County jail in August 2001, Hampton shared a cell with George Ridley.  Ridley testified at trial that Hampton admitted to committing the murders and told him the story of the murders every night for two weeks.  Hampton told Ridley that he killed Findley because "he was a rat" and he killed Ramsdell because Hampton was affiliated with the Aryan Brotherhood and thought that Ramsdell was a "nigger lover" who was pregnant with a Black man's child.  Hampton also told Ridley that he "thought it was funny" that Ramsdell had slept through the shooting of her boyfriend, and "bragged about the fact he was able to shoot [Ramsdell] in pretty much the same place he shot her old man."  Ridley also said that before leaving the house, Hampton knelt down next to Findley's body and whispered in his ear, "I want to let you know I took care of your nigger loving old lady and her little coon baby, too.  Don't worry, they didn't feel a thing."

¶7    The State originally charged Hampton by complaint with two counts of first degree murder for the deaths of Findley and Ramsdell, and one count of manslaughter for the death of Ramsdell's unborn child.  The State later filed an information and a Notice of Intention to Seek the Death Penalty, stating that it intended to prove "one or more of the enumerated factors" in Arizona Revised Statutes ("A.R.S.") § 13-703(F) (2001).

¶8    On May 2, 2002, a jury found Hampton guilty on all counts.  The State filed a Notice of Aggravating Factors on May 7, 2002, alleging two aggravating circumstances:  (1) A.R.S. § 13-703(F)(8) (multiple homicides); and (2) A.R.S. § 13-703(F)(6) (especially heinous or depraved; "whereby defendant knew victim Tanya Ramsdell was pregnant, and/or murdered her because he believed the baby's father was Black, creating and resulting in a racist murder, thereby murdering Tanya Ramsdell in order to murder her unborn baby").

¶9    On June 24, 2002, the United States Supreme Court held in *Ring v. Arizona* ("*Ring II*"), 536 U.S. 584 (2002), that the Sixth Amendment requires a jury to find the aggravating circumstances necessary for the imposition of the death penalty. The sentencing proceedings were therefore conducted before a new jury.

4

¶10    In the aggravation phase, the jury found both the (F)(6) and (F)(8) aggravating circumstances. With respect to the (F)(6) aggravator, the jurors unanimously concluded in a special verdict form that: (1) "The defendant relished the murder"; and (2) "The killing was senseless because it was unnecessary to achieve the defendant's criminal purpose, or the victim was helpless because she was unable to resist." In the penalty phase, the jury determined that the mitigating circumstances were not sufficiently substantial to call for leniency.

¶11    The superior court accordingly imposed death sentences for the two murder convictions. The trial judge also sentenced Hampton to an aggravated term of twelve and one-half years for manslaughter, to run consecutively to the death penalties. The convictions and sentences have been appealed to this Court.

## II.

### ISSUES ON APPEAL

¶12    Hampton raises eighteen issues on appeal. Two issues relate to the murder convictions and one to the manslaughter conviction. Fourteen issues relate to the sentences imposed. Hampton also raises claims in order to avoid federal preclusion, all of which concern the death sentences.

5

**Issues Relating to the Convictions**

**1.   Death Qualification of the Trial Jury**

**¶13**      The superior court denied Hampton's pre-trial motion to preclude "death qualification"[2] of the jury.  Hampton argues that the jury selection process violated the Eighth Amendment because the guilt phase jury was selected on the "false premises" that it would not decide aggravating factors or sentencing.

**¶14**      The United States Supreme Court has long held that the death qualification of juries is constitutional.  *See, e.g.,* *Wainwright v. Witt*, 469 U.S. 412, 424-25 (1985).  This Court repeatedly upheld the death qualification of trial juries before *Ring II*, when judges were responsible for sentencing decisions. *See, e.g.*, *State v. Hoskins*, 199 Ariz. 127, 141-42 ¶¶ 49-50, 14 P.3d 997, 1011-12 (2000); *State v. Anderson* ("*Anderson I*"), 197 Ariz. 314, 324 ¶ 24, 4 P.3d 369, 379 (2000).  After juries were assigned sentencing decisions, we upheld the death qualification of a jury in precisely the same procedural posture as Hampton's guilt phase jury – a jury that would have no role in the eventual sentencing of a defendant, even though a later jury

---

[2]      "Death qualification" refers to the process of questioning potential jurors to determine whether their qualms about the death penalty should preclude them from serving in a case in which the state seeks the death penalty.  *See State v. Moody*, 208 Ariz. 424, 449 ¶ 83, 94 P.3d 1119, 1144 (2004).

would.  *State v. Anderson* ("*Anderson II*"), 210 Ariz. 327, 337 ¶¶ 21-23, 111 P.3d 369, 379 (2005).  Hampton provides no reason for us to reconsider *Anderson II*.

¶15        In any event, the factual premise of Hampton's argument – that "jurors' death penalty scruples were mollified by the court's incorrect instruction that the jury would have no role in sentencing" – is wrong.  The guilt phase jury played no role in sentencing and therefore could not have been misled into thinking that responsibility for the determination of the proper sentence lay elsewhere.

**2.    Admission of Photographs of Victims**

¶16        Hampton claims that the trial court erred in admitting photographs of the victims during the guilt, aggravation, and penalty phases.  He argues that because he did not deny that the murders took place, but rather only claimed that he was not the murderer, the photographs "were irrelevant because they were probative only of matters not in dispute."[3]

¶17        We review the decision to admit a photograph for abuse of discretion.  *Id.* at 339 ¶ 39, 111 P.3d at 381.  The analysis is based on three factors:   the photograph's relevance, its

---

[3]    The thrust of Hampton's defense was that the murders were committed by someone else, possibly Tim Wallace, one of the persons at the East Roberts home smoking methamphetamine on the morning of May 17, 2001.

7

tendency to inflame the jury, and its probative value compared to its potential to cause unfair prejudice. *Id.*

¶18 Photographs of the deceased are relevant in a murder case "'because the fact and cause of death are always relevant in a murder prosecution.'" *State v. Spreitz*, 190 Ariz. 129, 142, 945 P.2d 1260, 1273 (1997) (quoting *State v. Chapple*, 135 Ariz. 281, 288, 660 P.2d 1208, 1215 (1983)). Photographs may also be relevant to prove the corpus delecti, to identify the victim, to show the fatal injury, to determine the atrociousness of the crime, to corroborate State witnesses, to illustrate testimony, or to corroborate the State's theory of the crime. *Anderson II*, 210 Ariz. at 339-40 ¶ 39, 111 P.3d at 381-82 (citing *Chapple*, 135 Ariz. at 288, 660 P.2d at 1215).

¶19 "Even if a defendant does not contest certain issues, photographs are still admissible if relevant because the burden to prove every element of the crime is not relieved by a defendant's tactical decision not to contest an essential element of the offense." *State v. Dickens*, 187 Ariz. 1, 18, 926 P.2d 468, 485 (1996) (citations and internal quotation omitted). Because "[t]here is nothing sanitary about murder," nothing in the rules of evidence "requires a trial judge to make it so." *State v. Rienhardt*, 190 Ariz. 579, 584, 951 P.2d 454, 459 (1997). Nonetheless, photographs must not be introduced "for

8

the sole purpose of inflaming the jury." *State v. Gerlaugh*, 134 Ariz. 164, 169, 654 P.2d 800, 805 (1982).

¶20 We have reviewed the contested photographs, which depict the bodies of Findley, Ramsdell, and the fetus. All but the photograph of the fetus show the nature and the placement of the victims' injuries and were thus relevant to corroborate the testimony of the State's witnesses. Although the photograph of the fetus is unsettling, it was relevant to both the manslaughter offense and the multiple homicides aggravator. The trial court excluded several other photographs because they were cumulative or potentially unduly prejudicial. On this record, we cannot conclude that the judge abused his discretion by determining that the probative value of the remaining photographs outweighed any danger of unfair prejudice.

## 3. Fetal Manslaughter

¶21 Hampton claims that the fetal manslaughter statute, A.R.S. § 13-1103(A)(5) (2001), applies only in cases in which the mother does not die.[4] When the mother also dies, Hampton argues, fetal manslaughter "is consumed in the mother's death."

---

[4] At the time Hampton was tried, § 13-1103(A)(5) provided that "[a] person commits manslaughter by: Knowingly or recklessly causing the death of an unborn child at any stage of its development by any physical injury to the mother of such child which would be murder if the death of the mother had occurred."

9

**¶22** We addressed this statute in *State v. Brewer*, 170 Ariz. 486, 826 P.2d 783 (1992). The facts in *Brewer* were similar to those here: the defendant murdered a pregnant woman and, in so doing, also killed the fetus. *Id*. at 492, 826 P.2d at 789. *Brewer* held that the defendant could not be charged with first degree murder of the fetus because § 13-1103(A)(5) "*specifically* deals with the facts of this case." *Id*. at 508, 826 P.2d at 805. *Brewer* thus makes clear that the fetal manslaughter statute applies in cases in which both the fetus and the mother die. *Id.; see also Passley v. State*, 21 S.E.2d 230, 232 (Ga. 1942) (reaching same conclusion as to similar Georgia statute).[5]

**¶23** Our discussion in *Brewer* was technically dictum, as the State never charged the defendant in that case with manslaughter under § 13-1103(A)(5). We nonetheless adhere to our analysis in *Brewer* today. Section 13-1103(A)(5) was plainly intended to protect the life of the fetus. It would therefore be illogical to interpret the statute as treating a murderer who successfully kills both mother and unborn child more favorably

---

[5] The Georgia statute provided that the "'wilful killing of an unborn child so far developed as to be ordinarily called 'quick', by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be punished by death or imprisonment for life, as the jury may recommend.'" *Passley*, 21 S.E.2d at 232 (quoting Ga. Code Ann. § 26-1103 (1876), currently codified at Ga. Code Ann. § 16-5-80 (West, Westlaw through 2005)).

10

than a murderer who manages to kill only the unborn child. The statute, although perhaps not worded felicitously, applies when the acts and mental state of the defendant would support a murder charge in the event the mother died, whether or not she actually does.

## B.

### Sentencing Issues

### 1. Retroactivity of 2002 Capital Sentencing Statute

¶24 After *Ring II*, the legislature amended Arizona's death penalty sentencing statutes. 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1. Hampton claims that applying the amended statutes to his case violated the Ex Post Facto Clauses of the federal and state constitutions, U.S. Const. art. I, § 10, cl. 1 and Ariz. Const. art. 2, § 25. Identical constitutional claims, however, were expressly rejected in *State v. Roseberry*, 210 Ariz. 360, 364-65 ¶ 18, 111 P.3d 402, 406-07 (2005), *Anderson II*, 210 Ariz. at 346 ¶ 74, 111 P.3d at 388, *State v. Carreon*, 210 Ariz. 54, 60-61 ¶¶ 17-21, 107 P.3d 900, 906-07 (2005), and *State v. Ring* ("*Ring III*"), 204 Ariz. 534, 547 ¶¶ 23-24, 65 P.3d 915, 928 (2003).

¶25 Hampton also claims A.R.S. § 1-244 (2002), which provides that "[n]o statute is retroactive unless expressly declared therein," bars application of the new statutes to his case. We rejected this argument in *Roseberry*, because the new

11

statutes expressly provide for retroactive application. 210 Ariz. at 365 ¶ 18 n.2, 111 P.3d at 407 n.2 (citing 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7).

## 2. Absence of Probable Cause Findings of Capital Aggravators

¶26    Hampton argues that the death penalty cannot be imposed because no finding of probable cause with respect to any of the aggravating circumstances was made either by a grand jury or at a preliminary hearing. As Hampton concedes, however, *McKaney v. Foreman*, 209 Ariz. 268, 272 ¶ 17, 100 P.3d 18, 22 (2004), expressly forecloses his contentions. We decline Hampton's invitation to revisit *McKaney*.

## 3. Notice of Aggravating Circumstances

¶27    Hampton claims the State violated A.R.S. § 13-703.01(B) (Supp. 2005)[6] by not providing notice of the alleged aggravating circumstances until after his conviction.[7] Hampton also argues that this procedure violated his constitutional

---

[6]    A.R.S. § 13-703.01(B), which was adopted in 2002 as part of the post-*Ring II* amendment of the capital sentencing statutes, provides: "Before trial, the prosecution shall notice one or more of the aggravating circumstances under § 13-703, subsection F."

[7]    The State filed a Notice of Aggravating Factors five days after Hampton's convictions. Post-conviction notice of alleged capital aggravators was permissible under then-applicable Arizona Rule of Criminal Procedure 15.1(g). Rule 15.1(i) now requires the State to provide a list of alleged aggravating factors within sixty days of arraignment.

12

rights to effective assistance of counsel, due process, and a fair and reliable capital sentencing proceeding.

¶28    We addressed and rejected Hampton's statutory arguments on identical facts in *Roseberry*, 210 Ariz. at 365-66 ¶¶ 19-25, 111 P.3d at 407-08, and *Anderson II*, 210 Ariz. at 347 ¶¶ 79-80, 111 P.3d at 389. We also rejected due process arguments in *Roseberry* and *Anderson II* indistinguishable from those raised today. *Roseberry*, 210 Ariz. at 365-66 ¶¶ 21-25, 111 P.3d at 407-08; *Anderson II*, 210 Ariz. at 347 ¶¶ 79-80, 111 P.3d at 389. Hampton received notice of the aggravating circumstances eight months before the aggravation phase of his trial and does not claim any prejudice from the fact that the notice came after conviction.

## 4.   New Jury for Aggravation and Penalty Phases

¶29    Hampton claims that the superior court erred in empanelling a second jury for the aggravation and penalty phases of the trial. He argues that the second jury was "deprived of evidence from the guilt trial" relevant to aggravation, mitigation, and the decision whether to impose the death penalty.

¶30    We held in *Anderson II* that a defendant has no absolute right to have the guilt phase jury also determine sentencing. 210 Ariz. at 347-48 ¶¶ 81-86, 111 P.3d at 389-90; *accord Ring III*, 204 Ariz. at 551 ¶ 39, 65 P.3d at 932

13

("Although completing a defendant's trial with the same judge or jurors is ideal, a defendant holds no absolute right to such an arrangement."). As was the case in *Anderson II*, Hampton does not identify any evidence from the guilt phase that would have been helpful to the aggravation/penalty jury, nor does he claim he was prevented from presenting any such evidence to that jury. 210 Ariz. at 347 ¶ 83, 111 P.3d at 389.

¶31 Hampton also argues that the penalty phase jury was "relieved from the gravity of their decision because they could rationalize that the [guilt phase] jury was responsible" for the sentencing decision. The penalty phase jurors, however, were expressly instructed to the contrary: "You, as jurors, are the sole judges of the facts and you alone determine whether the defendant is to receive the death penalty."

5. **Double Jeopardy**

¶32 Hampton argues that the sentencing proceedings violated the federal and state Double Jeopardy Clauses, U.S. Const. amend. V, and Ariz. Const. art. 2, § 10. He reasons that the maximum punishment he could have faced after the guilt phase was life imprisonment, as the then-existing statutory procedure for aggravation findings (by the judge) was unconstitutional. Hampton contends that subjecting him to proceedings before the second jury violated three core concerns of the Double Jeopardy Clauses: a prohibition on increasing the penalty to which a

14

defendant is exposed; a ban on allowing a new jury to "supplement" findings not made by a previous jury; and a preference for completing a trial before a single tribunal.

¶33     *Ring III* squarely addresses and rejects Hampton's argument.   204 Ariz. at 548-49 ¶¶ 29-32, 65 P.3d at 929-30. Hampton attempts to distinguish his situation from the defendants in *Ring III*, all of whom already had been sentenced by a judge.   Any such distinction, however, is precluded by *Anderson II*, in which we rejected double jeopardy claims from a defendant in an identical procedural posture as is Hampton.   *See Anderson II*, 210 Ariz. at 348 ¶ 87, 111 P.3d at 390.

## 6.   Standard of Review of Death Sentences

¶34     Hampton's opening brief argued that A.R.S. § 13-703.05(A) (Supp. 2005), which provides for appellate abuse of discretion review of death sentences, violates the separation of powers doctrine and the Eighth Amendment.   Hampton's reply brief, however, correctly abandoned these arguments.   Because Hampton's crime occurred before August 1, 2002, the effective date of the new capital sentencing scheme, § 13-703.05 does not apply.   *See* 2002 Ariz. Sess. Laws, 5th Spec. Sess., ch. 1, § 7(C) (providing that § 13-703.05(A) applies only to sentencings and resentencing "held after the effective date" of the amended capital sentencing statutes).   Rather, as required by former § 13-703.01 (2001) (renumbered as § 13-703.04 (Supp. 2005)), this

15

Court will independently review the jury's findings of aggravation and mitigation and the propriety of the death sentences. *See Roseberry*, 210 Ariz. at 370 ¶ 56, 111 P.3d at 412; *Carreon*, 210 Ariz. at 65 ¶ 50 n.11, 107 P.3d at 911 n.11.

**7.   Constitutionality of the (F)(6) Aggravator**

¶35      In *Walton v. Arizona*, the Supreme Court found the "especially heinous, cruel or depraved" aggravating factor, A.R.S. § 13-703(F)(6), "facially vague," but held that this Court's constructions of the statute furnished sufficient guidance to satisfy Eighth and Fourteenth Amendment concerns. 497 U.S. 639, 654-55 (1990).   Hampton argues that *Walton* sanctioned use of this aggravator only because judges (then responsible for finding aggravators) were assumed to understand and employ this Court's decisions.   Because jurors, not judges, now make findings of aggravation, Hampton argues that the (F)(6) aggravator is no longer constitutional.

¶36      We addressed and rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188 ¶¶ 41-42, 119 P.3d 448, 456 (2005), and in *Anderson II*, 210 Ariz. at 353 ¶¶ 113-114, 111 P.3d at 395.   Those cases hold that the (F)(6) aggravator may be constitutionally applied if given substance and specificity by jury instructions that follow this Court's constructions. *Cromwell*, 211 Ariz. at 188 ¶¶ 41-42, 119 P.3d at 456; *Anderson II*, 210 Ariz. at 353 ¶¶ 113-114, 111 P.3d at 395.

16

¶37     The question is thus whether the instructions given to Hampton's jury appropriately defined the facially vague terms "heinous" and "depraved" in accord with our prior decisions.[8] The instructions stated:

> The term "heinous or depraved manner" requires proof:
>
> the defendant relished the murder; *or*
>
> the killing was senseless because it was unnecessary to achieve the defendant's criminal purpose; *or*
>
> the victim of the killing was helpless because she was unable to resist.
>
> A finding the defendant relished the murder will support a finding the murder was committed in a heinous and depraved manner by itself.
>
> Because most murders are senseless and most victims are helpless, a finding of either or both will not alone support a finding the murder was committed in a heinous and depraved manner.
>
> If you find the murder of Tanya Ramsdell was committed in a "heinous or depraved" manner because the defendant relished the murder, or because the defendant relished the murder and the murder was senseless or the victim was helpless, you must then determine whether the murder was committed in an "especially" heinous or depraved manner.
>
> Proof the defendant "relished" the murder would be something the defendant said or did that indicates he savored the murder. It must contain words or actions that show debasement or perversion.

¶38     The comparable jury instructions in *Anderson II*, which we expressly approved, were as follows:

---

[8]     The "cruelty" prong of the (F)(6) aggravator was not submitted to the jury in this case.

17

The terms "heinous" and "depraved" focus on the defendant's mental state and attitude at the time of the offense as reflected by his words and actions. A murder is especially heinous if it is hatefully or shockingly evil. A murder is depraved if marked by debasement, corruption, perversion or deterioration.

In order to find heinousness or depravity, you must find beyond a reasonable doubt that the defendant exhibited such a mental state at the time of the offense by doing at least one of the following acts: One, relishing the murder. In order to relish a murder the defendant must show by his words or actions that he savored the murder. These words or actions must show debasement or perversion, and not merely that the defendant has a vile state of mind or callous attitude.

Statements suggesting indifference, as well as those reflecting the calculated plan to kill, satisfaction over the apparent success of the plan, extreme callousness, lack of remorse, or bragging after the murder are not enough unless there is evidence that the defendant actually relished the act of murder at or near the time of the killing.

210 Ariz. at 353 ¶ 111 n.19, 111 P.3d at 395 n.19.

¶39    The instructions in this case concerning "senselessness" and "helplessness" were in accord with *Anderson II* and our prior decisions defining those terms. The instructions correctly made clear that a mere finding that the murder was senseless and/or that the victim was helpless would not be sufficient to support a finding of the (F)(6) aggravator. *See State v. Trostle*, 191 Ariz. 4, 18, 951 P.2d 869, 883 (1997) ("Ordinarily, senselessness and helplessness alone are insufficient to establish heinousness or depravity.").

18

¶40     The same is not true, however, of the "relishing" instructions. In contrast to the instruction in *Anderson II*, the instructions here failed to specify that this factor focuses on the mental state of the defendant *at or near the time of the murder*, and that mere indifference, callousness, or even bragging afterward do not alone constitute relishing. *See State v. Lujan*, 124 Ariz. 365, 372, 604 P.2d 629, 636 (1979) ("In determining whether a murder has been committed in an especially heinous or depraved manner, we must necessarily consider the killer's state of mind *at the time of the offense*.") (emphasis added); *see also State v. Johnson*, 212 Ariz. 425, 732 ¶ 23, 133 P.3d 735, 742 (2006) (upholding instructions that heinousness or depravity "referred to the defendant's state of mind only at the time of the offense" but recommending use of the more detailed *Anderson II* instructions). Nor did the instructions here state, as did those in *Anderson II*, that the defendant's actions or words after the fact are relevant to a finding of heinousness/depravity only insofar as they shed light on the defendant's mental state at or near the time of the killings. *See Anderson II*, 210 Ariz. at 353 ¶ 111 n.19, 111 P.3d at 395 n.19; *State v. Greene*, 192 Ariz. 431, 440 ¶ 39, 967 P.2d 106, 115 (1998) ("Post-murder behavior is relevant to prove heinousness or depravity [only] when it provides evidence of 'a killer's vile state of mind *at the time of the murder*.'")

19

(quoting *State v. Gretzler*, 135 Ariz. 42, 51, 659 P.2d 1, 10 (1983)).

¶41     *Walton* held that our prior constructions save what would otherwise be an unconstitutionally vague (F)(6) aggravator.  497 U.S. at 654-55.  Indeed, in opposing Hampton's pre-trial motion to strike the (F)(6) aggravator, the State recognized this and promised to "submit jury instructions in this case regarding A.R.S. § 13-703(F)(6) which encompass all of the narrowing factors formulated by the Arizona Supreme Court that have been held to render that aggravating circumstance constitutional."

¶42     The instructions given in this case, however, did not follow our previous decisions and allowed the jury to find the (F)(6) aggravator on the basis of "relishing" that may have occurred months after the crime.  We therefore will not consider the (F)(6) aggravator in our determination of whether the death penalty was appropriately imposed in this case.  *See Anderson II*, 210 Ariz. at 356 ¶ 130, 111 P.3d at 398.

**8.  Expert Mental Health Testimony**

¶43     Hampton obtained an opinion as to his mental health from an expert, Dr. Rosengard.  The expert's opinion was based in part on an interview of Hampton.  Hampton, however, refused to consent to an evaluation by the State's mental health expert.  The trial judge therefore ruled that Dr. Rosengard could not

20

discuss in his testimony either his interview with Hampton or any opinion based on that interview. Hampton then declined to present Dr. Rosengard's testimony. Hampton now challenges the court's ruling on Eighth Amendment grounds.

¶44 We rejected an identical argument in *Carreon*, 210 Ariz. at 68-69 ¶ 74, 107 P.3d at 914-15, and *Phillips v. Araneta*, 208 Ariz. 280, 285 ¶ 15, 93 P.3d 480, 485 (2004). *Carreon* held that a trial judge may *entirely* preclude a capital defendant from presenting mental health expert testimony as mitigation evidence if the defendant refuses to submit to an examination by the State's mental health expert. 210 Ariz. at 68-69 ¶ 74, 107 P.3d at 914-15 (citing *Phillips*, 208 Ariz. at 283 ¶ 9, 93 P.3d at 483). Here, in contrast, the trial court precluded only the portion of Hampton's proposed mental health mitigation evidence based on the expert's interview with Hampton.

## 9. Testimony of Monica Majors

¶45 Hampton contends that the trial court abused its discretion by admitting testimony in the penalty phase by his former girlfriend, Monica Majors, regarding several previous violent acts committed by Hampton.[9] He argues that her testimony

---

[9] Majors testified that Hampton had committed various acts of violence against her: "He's beat me severely. Put me in the hospital. Tied me up and left me in a closet. Beat me. Put knives to my throat and stuff like that." Majors also said she

21

should have been excluded because Hampton's character for violence was not at issue and, even if relevant, the testimony was more prejudicial than probative under Arizona Rule of Evidence 403.  We review trial court decisions admitting or excluding evidence for abuse of discretion.  *State v. Roscoe*, 184 Ariz. 484, 491, 910 P.2d 635, 642 (1996).

**a.**

**¶46**　　　Hampton's primary argument – that the admission of this evidence violated Rule 403 – is easily answered.  The governing statute, A.R.S. § 13-703(C), expressly provides that the rules of evidence do not apply in the penalty phase:

> At the penalty phase of the sentencing proceeding . . . the prosecution or the defendant may present any information that is relevant to any of the mitigating circumstances . . . regardless of its admissibility under the rules governing admission of evidence at criminal trials.

---

saw Hampton's oldest brother, Jim, on May 14, 2001, three days before the murders.  Jim had a bloody gash on his head where, Jim told Majors, Hampton had pistol whipped him.  Majors testified that Jim told her that Hampton was mad at her and "that he was going to come over and try to kill me."  She further testified that in 2001, before the murders of Ramsdell and Findley, Hampton told Majors that he had shot a man in the leg.  She said she saw Hampton after the murders, on May 18, 2001, and "[h]e was basically saying his good-byes, basically. He gave me a hug and whispered, 'I did it.'"  Majors also testified that Hampton told her after the preliminary hearing that what Misty Ross had said at that hearing was true.  Hampton threatened to have Majors' son kidnapped if she did not bring him to see Hampton in jail.  She said Hampton had told her, "The only reason you live is you have my Aryan baby."  Finally, Majors testified that she was told that Hampton was trading psychiatric medications with other inmates.

22

Indeed, applying the rules of evidence to the penalty phase would exclude much of the mitigation evidence that defendants routinely present at penalty phase hearings.[10]

¶47    The only limit that § 13-703(C) places on the State's evidence at the penalty phase is that it must be "relevant" to the issue of mitigation.  *See State v. McGill*, ___ Ariz. ___, ___ ¶ 40, ___ P.3d ___, ___ (2006); *see also* A.R.S. § 13-703.01(G) (providing that the State may present at the penalty stage "any evidence that is relevant to the determination of whether there is evidence that is sufficiently substantial to call for leniency").[11]  Hampton's penalty phase evidence included

---

[10]    The Eighth Amendment does not, contrary to Hampton's arguments, limit the State to urging statutory aggravating factors at the penalty stage:

> [S]tatutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition:  they circumscribe the class of persons eligible for the death penalty.  But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.

*Zant v. Stephens*, 462 U.S. 862, 878 (1983).  *See also People v. Dunlap*, 975 P.2d 723, 740 (Colo. 1999) ("Once the jury finds that the defendant falls within the legislatively defined category of persons eligible for the death penalty, . . . the jury then is free to consider a myriad of factors to determine whether death is the appropriate punishment.").

[11]    At oral argument the State suggested that § 13-703.01(G) provides no broader warrant for the admission of rebuttal evidence in the penalty phase than does A.R.S. § 13-703(C).  Section 13-703.01(G), like § 13-703(C) contains an express

23

testimony by the daughter of a former girlfriend that Hampton "took the part of a father that I didn't have at the time" and that Hampton was "a loving father" to his daughter; testimony by Hampton's mother and sister that Hampton cares for his three children; testimony by Hampton's half-sister that she had always been very close to Hampton and that he was protective of her and would stick up for her as her big brother; and testimony by others that Hampton had treated them fairly and respectfully. The thrust of this mitigation evidence was that Hampton was a caring person who deserved leniency. Majors' testimony regarding Hampton's abusive treatment of her and his brother directly rebutted this mitigation evidence and was therefore relevant to the issue of mitigation.

**b.**

¶48 Our statutes, however, do not provide the only limitation of rebuttal testimony in the penalty phase. Admission of such evidence is ultimately constrained by the Due Process Clause of the Fourteenth Amendment. *See Payne v. Tennessee*, 501 U.S. 808, 825 (1991); *Gardner v. Florida*, 430

---

relevance requirement, mandating that the State's evidence be "relevant to the determination of whether there is mitigation that is sufficiently substantial to call for leniency."

24

U.S. 349, 358 (1977).  Hampton claims that he was deprived of due process because some of Majors' testimony was hearsay.[12]

**¶49**    In *State v. Greenway*, we held that due process requires that a capital defendant receive notice of any hearsay statements to be introduced by the State in rebuttal to mitigation and have "an opportunity to either explain or deny them."  170 Ariz. 155, 161, 823 P.2d 22, 28 (1992).  We most recently held in *McGill*, ___ Ariz. at ___ ¶ 56, ___ P.3d at ___, that the Due Process Clause also demands that hearsay statements contain sufficient indicia of reliability.

**¶50**    The hearsay statements offered through Majors met these due process standards.  The most damaging hearsay involved Majors' conversation with Hampton's brother Jim about injuries allegedly inflicted upon him by Hampton.[13]  Hampton does not

---

[12]    Hampton correctly does not raise a Confrontation Clause objection to Majors' testimony.  Much of her testimony involved her first-hand observations, such as Hampton's treatment of her and his statements to her, and was subject to cross-examination. Moreover, to the extent that Majors' testimony included hearsay, it plainly was not "testimonial" because the hearsay statements were made to her, not to agents of the state, and were not made for use in any litigation. *See Crawford v. Washington*, 541 U.S. 36, 51 (2004) (defining as "testimonial" those "statements that [the] declarants would reasonably expect to be used prosecutorially").  This case therefore presents no issue as to the applicability of the Confrontation Clause to the penalty phase of a capital trial. *See McGill*, ___ Ariz. at ___ ¶¶ 45-52, ___ P.3d at ___.

[13]    Majors also testified about a conversation with a woman who said that Hampton traded medication with others in jail. However, because the defense introduced testimony of Hampton's

contest that he had prior notice of this testimony and the opportunity to rebut it.[14]  And there is a strong indication of reliability as to this testimony – Majors actually saw the wound allegedly inflicted by Hampton on Jim's forehead.  The admission of these hearsay statements therefore did not violate Hampton's due process rights.[15]

### c.

¶51      Although we find that the admission of prior bad acts testimony in this case violated neither the Due Process Clause nor our statutes, we offer a word of caution for future cases. Trial courts can and should exclude evidence that is either irrelevant to the thrust of the defendant's mitigation or otherwise unfairly prejudicial.  Nothing in our death penalty

_____

drug dependency as mitigation, any prejudice from this testimony was negligible.

[14]   Jim was incarcerated at the time of Hampton's trial and therefore available to be called as a witness if Hampton had so chosen.

[15]   In a supplemental brief filed after oral argument, Hampton challenges the penalty phase rebuttal testimony of Detective Cliff Jewell on the same grounds raised with respect to Monica Majors' testimony.  Jewell testified about much of the same evidence of violent behavior and racist leanings to which Majors testified, including the assault on Jim.  Given the close similarity of Jewell's testimony to Majors' testimony, our analysis applies equally to both.  Hampton did not raise a Confrontation Clause objection to Detective Jewell's testimony either at trial or in his supplemental brief.  Even if such an argument had been raised on appeal, moreover, it would be difficult to view any error in admitting Jewell's testimony as fundamental, given its similarity to Majors' testimony.

26

statutes strips courts of their authority to exclude evidence in the penalty phase if any probative value is substantially outweighed by the prejudicial nature of the evidence. Trial courts should not allow the penalty phase to devolve into a limitless and standardless assault on the defendant's character and history. Rather, trial judges should exercise their broad discretion in evaluating the relevance of such bad acts evidence to any mitigation evidence offered. *See McGill*, ___ Ariz. at ___ ¶ 40, ___ P.3d at ___ (stating that a "judge's analysis [of evidence under A.R.S. § 13-703] involves fundamentally the same considerations as does a relevancy determination under Arizona Rule of Evidence 401 or 403").

**10. Presumption of Death**

¶52      Hampton argues that our death penalty statutes create a "presumption of death." This presumption, he claims, arises from A.R.S. § 13-703(E), which requires a sentence of death if the trier of fact finds at least one aggravator and no mitigation sufficiently substantial to call for leniency. This argument, however, was expressly rejected in *Anderson II*, 210 Ariz. at 346 ¶ 77, 111 P.3d at 388.

¶53      Hampton also claims that the "fact" that mitigating circumstances are not sufficiently substantial to call for leniency is essentially an "element" of capital murder and the State has the burden of proving that fact. To the extent that

27

Hampton is arguing that a defendant cannot constitutionally be required to prove the existence of mitigating facts, *Anderson II* also rejects that claim. *Id.*

¶54    Insofar as Hampton claims he was unconstitutionally saddled with the burden of proving that mitigating circumstances were sufficiently substantial to call for leniency, his factual premise is wrong.  The jury was instructed that "[n]either the State [n]or the defendant has a burden of proof with regard to weighing whether the mitigation is sufficiently substantial to call for leniency."  This instruction was in accord with *State ex rel. Thomas v. Granville (Baldwin)*, in which we noted that "[a]lthough § 13-703(C) requires the defendant to prove mitigating circumstances by a preponderance of the evidence, the statutory scheme does not place any burden of proof on the defendant in connection with establishing that the mitigation evidence is sufficiently substantial to call for leniency."  211 Ariz. 468, 472 ¶ 14, 123 P.3d 662, 666 (2005).

**11.  Instruction on Sympathy or Prejudice**

¶55    Hampton argues that the trial court erred by twice instructing the sentencing proceeding jury not to be influenced by sympathy or prejudice.[16]   The instruction, he claims,

---

[16]    During the aggravation phase, the jury was told "You must use these rules to decide this case whether you agree with them or not.  You must not be influenced by sympathy or prejudice." The penalty phase instruction was identical.

28

prevented the jury from being able to give effect to all mitigating evidence, as required by Supreme Court precedent for death penalty cases. *See, e.g.*, *Eddings v. Oklahoma*, 455 U.S. 104, 113-14 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

**¶56** We rejected this argument in *Anderson II*, 210 Ariz. at 349 ¶ 92, 111 P.3d at 391. Moreover, Hampton not only failed to object to the instruction he now challenges, but actually argued on the basis of this instruction that jurors should disregard the State's purported appeals for sympathy for the victims.

## 12. Victim Impact Statements

**¶57** Hampton asserts that the victim impact evidence, particularly the statement of Charles Findley's mother, was unduly prejudicial. Specifically, Hampton contends that her statement exceeded the permissible bounds of relevance and that she testified to matters explicitly precluded by the judge.

**¶58** *Payne v. Tennessee* held that "[a] State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827. Arizona permits victim impact evidence to rebut a defendant's mitigation evidence. *State v. Glassel*, 211 Ariz. 33, 54 ¶ 82, 116 P.3d 1193, 1214 (2005). Such evidence, however, cannot be "so unduly

prejudicial that it renders the trial fundamentally unfair." *Payne*, 501 U.S. at 825.

¶59 In this case, the superior court carefully reviewed the victims' statements prior to their submission to the penalty phase jury. The court excluded a portion of Findley's mother's statement which claimed that "these people went through [Findley's] 401K and stock money."

¶60 The stricken portion of the mother's statement was not presented to the jury. Nonetheless, during her testimony, Findley's mother used the words "these people" in the following context:

> He started hanging around the wrong people. I told him I – to tell you the truth I don't know how he met these people he never went out of the house. But that's where they all hung out. I told Charles that these people weren't his friends. They were just there using him. But he couldn't see that because of the depression that he was in. Charles never drank. He never smoked. He didn't have any tattoos. But he did – but these people did get him into drugs. Charles was always against drugs because my youngest brother is a druggie and we haven't talked to him for 22 years because he destroyed our family. Charles was the type of person that always would give you the shirt off of his back, food to eat, a place to stay, or food to eat. These people knew that Charles was an easy target and they took advantage of this. Charles was my best friend; I'm proud of him. His daughter, age 3, has to grow up without him. He was always there for us when we needed help; he always made us laugh when things were bad. His murder has affected the whole family and his close true friends. I had to use all my savings to pay for his funeral. I no longer want to do anything. I am lost. Charles meant everything to me. I have lost my house, my work, my

30

mind; I'm not myself anymore and I don't think I ever will be.

¶61    Hampton contends that these statements were unduly prejudicial and violated the court's order.  Because he raised no such objection below, we review only for fundamental error. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005).

¶62    We find no error, much less fundamental error, in the admission of these statements.  The statements focus directly on the impact of the loss of a son and are not unduly prejudicial. Nor can the statements be viewed as violating the trial judge's order.  The judge ordered that the impact statement "delete the reference to the people who went through the 401K, and the stock money."  The brief references to "these people" in the admitted statement do not contravene that order.

## 13.  Fetal Manslaughter Sentence

¶63    Hampton contends that his manslaughter sentence should not have been consecutive to the two death sentences because of the prohibition on double punishment in A.R.S. § 13-116 (2001). He argues that, because both Tanya Ramsdell and the fetus were killed with a single gunshot, the crime should be deemed a "single act" for which consecutive sentences cannot be imposed.

¶64    Under A.R.S. § 13-116, "[a]n act or omission which is made punishable in different ways by different sections of the

31

laws may be punished under both, but in no event may sentences be other than concurrent." The statute bars consecutive sentences when the defendant's conduct is a "single act." *State v. Gordon*, 161 Ariz. 308, 315, 778 P.2d 1204, 1211 (1989).

¶65 The statute, however, does not prevent consecutive sentences for crimes involving multiple victims:

> A.R.S. § 13-116 has never been interpreted literally. For instance, the words of the statute draw no distinction between single victims and multiple victims. Nevertheless, our courts have held that a single act that harms multiple victims may be punished by consecutive sentences.

*Id.* at 313 n.4, 778 P.2d at 1209 n.4 (citations omitted). In this case, Ramsdell's unborn child was a victim of a crime under § 13-1103(A)(5), and the sentence for that homicide can be imposed consecutively to the sentences for the murders of Findley and Ramsdell.

**14. Aggravated Manslaughter Sentence**

¶66 Hampton argues that the superior court violated the rule of *Blakely v. Washington*, 542 U.S. 296 (2004), by imposing a twelve and one-half year sentence for the manslaughter conviction based upon findings by the judge that a weapon was used in the commission of the crime and that other aggravators were proven.

¶67 "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed

32

statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). "[T]he 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely*, 542 U.S. at 303. In this case, the statutory maximum for manslaughter, a class two felony, *see* A.R.S. § 13-1103(B), was the presumptive term of five years, *see* A.R.S. § 13-701(C)(1), in the absence of factual findings required to impose an aggravated or enhanced sentence. *See* *State v. Anderson* ("*Anderson III*"), 211 Ariz. 59, 60 ¶ 3, 116 P.3d 1219, 1220 (2005). We must therefore determine what other factual findings were necessary to impose the aggravated sentence of twelve and one-half years.

¶68 The first question is under which statutes Hampton was sentenced. The sentencing minute entry states that the manslaughter conviction was a "Class 3 Felony"[17] found to be dangerous pursuant to A.R.S. § 13-604 (2001), and references §§ 13-604(P), -701, and -702. Immediately before the judge imposed sentence, however, defense counsel stated that "my review of the file would indicate that" the manslaughter conviction "is a non-

---

[17] Manslaughter is a class two, not a class three felony. A.R.S. § 13-1103(B).

dangerous, non-repetitive offense." The judge agreed: "And after reviewing the file I believe that's correct."

**¶69** The manslaughter was in fact charged as a dangerous offense because either a weapon was used or serious injury was inflicted. *See* A.R.S. § 13-604(P) (defining dangerous offense). In addition, the pre-sentence report stated that the manslaughter conviction "carries a presumptive sentence of 10.5 years; a minimum sentence of 7 years, and a maximum sentence of 21 years." These numbers correspond to the sentencing range for a class two dangerous felony pursuant to § 13-604(I).

**¶70** The jury, however, was never asked to make any finding of dangerousness as required by § 13-604(P), which states that an enhanced sentence under § 13-604 shall be imposed only if the dangerous nature of the offense is admitted or "found by the trier of fact." We therefore agree with the trial judge's characterization of the conviction as one for a non-dangerous and non-repetitive offense.

**¶71** Because the offense was non-dangerous and non-repetitive, a twelve and one-half year sentence was possible only upon the finding of at least two aggravating factors. *See* A.R.S. § 13-702.01(A) (2001) (governing sentences for defendants with no prior felony convictions). The judge relied on three aggravators: (1) use of a weapon, A.R.S. § 13-702(C)(2) (2001); (2) the heinous and depraved nature of the murder of Ramsdell,

34

A.R.S. § 13-702(C)(5); and (3) the fact that two other murders were committed at the same time that the manslaughter offense occurred, which presumably fell under former A.R.S. § 13-702(C)(18) ("[a]ny other factor that the court deems appropriate to the ends of justice").[18]  The jury did not make any finding as to the existence of any of these aggravators with respect to the manslaughter count.  Hampton thus claims *Blakely* error.

**¶72**     *Blakely* error, however, can be harmless if no reasonable jury, on the basis of the evidence before it, could have failed to find the minimum number of aggravators necessary to expose the defendant to the sentence imposed.  *Henderson*, 210 Ariz. at 569 ¶ 28, 115 P.3d at 609.[19]  In this case, no reasonable jury could have failed to find that a deadly weapon was used in the commission of the offense.  The autopsy expert testimony made clear that Ramsdell was killed by a bullet wound to her head.  The death of Ramsdell, in turn, clearly caused the death of the fetus.

---

[18]   The trial judge did not provide any statutory citation for the aggravators he found.  We reiterate that, "[i]n order to facilitate appellate review, trial judges should indicate on the record the specific statutory subsection under which a criminal sentence is imposed."  *Anderson III*, 211 Ariz. at 61 ¶ 4 n.1, 116 P.3d 1219, 1221 n.1.

[19]   Hampton timely demanded a jury determination of aggravating factors.  Our review of this claim is thus under a harmless error standard.  *See Henderson*, 210 at 567 ¶ 18, 115 at 607.

¶73    Similarly, the finding that two other murders were committed at the same time as the fetal manslaughter also was, at worst, harmless error.  The evidence on this point was not disputed.    Moreover, this aggravation finding is arguably implicit in the jury's finding of the multiple homicides aggravator with respect to the murder of Ramsdell.[20]

¶74    Two aggravators were sufficient to expose Hampton to the twelve and one-half year sentence imposed under A.R.S. § 13-702.01(A).  *See State v. Martinez*, 210 Ariz. 578, 584 ¶ 21, 115 P.3d 618, 624 (2005).  Therefore, any *Blakely* error was harmless.

### III.

### CLAIMS RAISED TO AVOID FEDERAL PRECLUSION

¶75    To preserve the issues for federal review, Hampton raises thirteen other claims that the death penalty is unconstitutional.  The claims are followed by citations to cases in which Hampton states that this Court has rejected the

---

[20]    Hampton does not challenge, other than on the basis of the lack of a jury determination, the propriety of relying on any of the aggravators, including the multiple murders aggravator, under the (C)(18) "catchall."  *See Glassel*, 211 Ariz. at 58-59 ¶¶ 103-04, 116 P.3d at 1217-18.  We therefore need not decide whether, in light of *Blakely*, it remains proper to rely on the "catchall" aggravator to impose an aggravated sentence. *See id.*

36

argument.[21]   These claims and citations, as listed by Hampton, are repeated verbatim in the appendix to this opinion.

## IV.

### INDEPENDENT REVIEW

**¶76**     Although Hampton has not briefed the issue, we must independently review the jury's findings of aggravating circumstances and its determination that sentences of death were warranted for each murder.  A.R.S. § 13-703.04(A); *see also Glassel*, 211 Ariz. at 55 ¶ 92, 116 P.3d at 1215 (reviewing propriety of death sentence in absence of urging by appellant); *Anderson II*, 210 Ariz. at 354 ¶ 119 n.21, 111 P.3d at 396 n.21 (describing independent duty to review capital aggravation findings).

### A.

### Aggravating Circumstances

**¶77**     The jury found two aggravating circumstances as to the murder of Ramsdell and one as to Findley:  (1) that the murders of Findley and Ramsdell were each committed during the commission of one or more other homicides, *see* A.R.S. § 13-703(F)(8), and (2) that the murder of Ramsdell was committed in an especially heinous or depraved manner, *see* A.R.S. § 13-703(F)(6).  The jury concluded during the penalty phase that the

---

[21]     One claim is not accompanied by a citation:  Hampton's claim that imposition of the death penalty under the facts of this case constitutes cruel and unusual punishment.

37

mitigating circumstances were not sufficiently substantial to call for leniency. *See* A.R.S. § 13-703(E).

¶78    We have determined that the jury was improperly instructed as to the (F)(6) aggravator, *see supra*, ¶¶ 35 to 42, and will therefore not consider that circumstance in our independent review. *See* A.R.S. § 13-703.04(B) (providing that "[i]f the supreme court determines that an error was made regarding a finding of aggravation . . . the supreme court shall independently determine if the mitigation the supreme court finds is sufficiently substantial to warrant leniency in light of the existing aggravation"). We therefore turn to the only remaining aggravator:  that "[t]he defendant has been convicted of one or more other homicides, as defined in § 13-1101, that were committed during the commission of the offense." A.R.S. § 13-703(F)(8).

¶79    Proof of the (F)(8) aggravator requires "more than that the jury convicted the defendant of first degree murder and one or more other homicides occurring around the same time." *Ring III*, 204 Ariz. at 560 ¶ 80, 65 P.3d at 941. Rather, the statutory requirement that the homicides occur "during the commission of the offense" necessitates proof of a "continuous course of criminal conduct" in which the murders have "temporal, spatial, and motivational relationships." *State v. Rogovich*, 188 Ariz. 38, 45, 932 P.2d 794, 801 (1997) (citation omitted).

38

¶80     The evidence in this case compels a finding of the (F)(8) aggravator as to both first degree murders.  The killing of each victim – Findley, Ramsdell, and Ramsdell's unborn child – qualifies as a homicide for purposes of this aggravator.  *See* A.R.S. § 13-703(F)(8) (referring to "homicides, as defined in § 13-1101"); A.R.S. § 13-1101 (defining "homicide" as first degree murder, second degree murder, manslaughter or negligent homicide); A.R.S. § 13-1103(A)(5) (defining fetal manslaughter). The three homicides were clearly closely related in time, space, and motivation.

¶81     The (F)(8) multiple homicides aggravator is extraordinarily weighty.  *See Rogovich*, 188 Ariz. at 46, 932 P.2d at 802 (1997) (finding the (F)(8) aggravator carried more weight than other aggravators).  As the victim impact statements in this case illustrate, the murder of two people wreaks twice the horror and sorrow as the murder of one.  A triple homicide triples the loss.  The next issue is whether the mitigation evidence was sufficiently substantial to call for leniency in light of this aggravator.

### B.

### Mitigation Evidence

¶82     The majority of the mitigation evidence detailed Hampton's very difficult personal and family history.  Hampton's mother, Joyce Bivins, was an alcoholic who married four times

over the course of Hampton's childhood. Hampton's biological father and his stepfathers were also alcoholics who physically and verbally abused him. Both of Hampton's older brothers, Jim and Steven, began using drugs at early ages and were incarcerated for various periods starting when they were adolescents. Jim sexually molested both Hampton and their younger half-sister.

¶83 Throughout Hampton's childhood, his family moved so often that his mother "couldn't even speculate" as to how many places they lived. From ages twelve to fifteen, Hampton lived mostly in foster care, including at least six different homes over the course of two years.

¶84 Hampton has struggled with mental health problems from childhood. At different stages in his life Hampton has been prescribed Ritalin, various psychotropic medications, and Haldol, an anti-psychotic. Records show that Hampton's problems ranged from attention deficit disorder to depression to major affective disorder to antisocial personality disorder. Hampton's first recorded suicide attempt occurred when he was eleven and, by age twenty-five, Hampton reported having made three additional attempts.[22]

---

[22] Hampton also had an extensive juvenile record. At age seven, he pulled a knife on a babysitter. At thirteen, he was an accessory to a residential burglary in which guns were stolen. By age fourteen, Hampton had been arrested for shooting

¶85     Hampton's older brother Jim first injected Hampton with heroin when Hampton was eleven. Hampton first tried crystal methamphetamine at age thirteen and by age twenty was regularly using both it and cocaine. Despite repeated admissions to drug treatment programs, he continued using crystal methamphetamine. He used the drug just a few hours before the murders.

¶86     Hampton has three children with three different mothers. His middle child was taken from her mother's custody because of her mother's drug use. Hampton's half-sister said he cares about his children but has "never really been in their lives."

¶87     Several individuals testified their race was never an issue in their relationships with Hampton, despite the fact that each belongs to a minority group. An ex-girlfriend testified that Hampton "was a really sweet guy." A daughter of another of Hampton's ex-girlfriends testified that Hampton acted as a "loving father" towards her, even though he is not her father.

_____

BBs at a neighbor's garage door, contacted by police for shoplifting a BB gun, arrested for entering a neighbor's house and stealing a coat, and arrested for entering a residence and stealing a small amount of cash. In 1987, Hampton stabbed his mother's fourth husband and was sent to Adobe Mountain, a juvenile detention center in Phoenix, where he joined a group calling itself the "Third Reichers." He was placed in juvenile detention on two other occasions.

¶88     Hampton's younger half-sister testified that she is married to a Hispanic man and that Hampton got along "very well" with her husband and his family.  She said that she and Hampton have always been very close and that he was a protective big brother.

## C.

### Propriety of the Death Sentence

¶89     Hampton's mitigation evidence is not insubstantial; it is fair to say that he had a horrendous childhood.  We have previously emphasized, however, that a "difficult family background, in and of itself, is not a mitigating circumstance" sufficient to mandate leniency in every capital case.  *State v. Wallace*, 160 Ariz. 424, 427, 773 P.2d 983, 986 (1989).  Moreover, while we "do not require that a nexus between the mitigating factors and the crime be established before we consider the mitigation evidence . . . the failure to establish such a causal connection may be considered in assessing the quality and strength of the mitigation evidence."  *State v. Newell*, 212 Ariz. 389, 405 ¶ 82, 132 P.3d 833, 849 (2006) (internal citation omitted); *accord Johnson*, 212 Ariz. at 440 ¶ 65, 133 P.3d at 750; *Anderson II*, 210 Ariz. at 349-50 ¶¶ 93-97, 111 P.3d at 391-92.  Hampton's troubled upbringing is entitled to less weight as a mitigating circumstance because he has not

tied it to his murderous behavior.[23]  Further, Hampton was thirty years old when he committed his crimes, lessening the relevance of his difficult childhood.

¶90     More importantly, Hampton committed not one, but three homicides.  Because the multiple homicides aggravator is of extraordinary weight, we find that the mitigation evidence is not sufficiently substantial to call for leniency and uphold the death sentences.

## V.

## CONCLUSION

¶91     For the reasons above, we affirm Hampton's convictions and sentences for the murders of Charles Findley and Tanya Ramsdell and his conviction and sentence for the manslaughter of Ramsdell's unborn child.

_____
                   Andrew D. Hurwitz, Justice

CONCURRING:

_____
Ruth V. McGregor, Chief Justice

---

[23]    Hampton chose not to present any contemporary mental health expert testimony because portions of that testimony were precluded in response to Hampton's refusal to meet with the State's mental health expert. *See supra*, ¶¶ 43-44.

_____
Rebecca White Berch, Vice Chief Justice


_____
Michael D. Ryan, Justice


_____
W. Scott Bales, Justice

## Appendix

## Claims Raised to Avoid Federal Preclusion

Arizona's Death Penalty is Unconstitutional.

1.    The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution.  *State v. Harrod*, 200 Ariz. 309, 320, 26 P.3d 492, 503 (2001).

2.    The death penalty is imposed arbitrarily and irrationally in Arizona in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution, as well as Appellant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, § 4 of the Arizona Constitution.  *State v. Beaty*, 158 Ariz. 232, 762 P.2d 519 (1988).

3.    Application of the death penalty on the facts of this case would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution.

4.    The prosecutor's discretion to seek the death penalty has no standards and therefore violates the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, §§ 1, 4, and 15 of the Arizona Constitution. *State v. Sansing*, 200 Ariz. 347, 361, 26 P.3d 1118, 1132 (2001).

5.    Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, §§ 1, 4, and 13 of the Arizona Constitution. *Sansing*, 200 Ariz. at 361, 26 P.3d at 1132.

6.    The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Harrod*, 200 Ariz. at 320, 26 P.3d at 503.  Proportionality review serves to identify which cases are above the "norm" of

45

first-degree murder thus narrowing the class of defendants who are eligible for the death penalty.

7. Arizona's capital sentencing scheme is unconstitutional because it does not require that the State prove that the death penalty is appropriate. Failure to require this proof violates the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Ring*, 200 Ariz. 267, 284, 25 P.3d 1139, 1156 (2001) (*Ring I*), *rev'd on other grounds by Ring v. Arizona*, 536 U.S. 584, 122 S.Ct. 2428, 2443 (2002).

8. A.R.S. § 13-703.01 provides no objective standards to guide the sentencing judge in weighing the aggravating and mitigating circumstances and therefore violates the Eighth and Fourteenth Amendments of the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Pandeli*, 200 Ariz. 365, 382, 26 P.3d 1136, 1153 (2001).

9. Arizona's death penalty scheme is unconstitutional because it does not requires the sentencer to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances, in violation of the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution and Article 2, §§ 4 and 15 of the Arizona Constitution. *State v. Poyson*, 198 Ariz. 70, 83, 7 P.3d 79, 92 (2000).

10. A.R.S. § 13-703.01 does not sufficiently channel the sentencer's. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. The broad scope Arizona's aggravating factors encompasses nearly anyone involved in murder, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *Pandeli*, 200 Ariz. at 382, 26 P.3d at 1153.

11. Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Hinchey*, 181 Ariz. 307, 315, 890 P.2d 602, 610 (1994).

12. Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one

aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

13. Arizona's death penalty statute is unconstitutional in that it requires defendants to prove their lives should be spared, in violation of the Eighth and Fourteenth Amendments to the United States Constitution and Article 2, § 15 of the Arizona Constitution. *State v. Fulminante*, 161 Ariz. 237, 258, 778 P.2d 602, 623 (1988).