SUPREME COURT OF ARIZONA
En Banc

| | | |
|---|---|---|
| STATE OF ARIZONA, | ) | Arizona Supreme Court |
| | ) | No. CR-05-0174-AP |
| Appellee, | ) | |
| | ) | Maricopa County |
| v. | ) | Superior Court |
| | ) | No. CR2002-009759 |
| STEVE ALAN BOGGS, | ) | |
| | ) | |
| Appellant. | ) | **A M E N D E D** |
| | ) | **O P I N I O N** |
| | ) | |

Appeal from the Superior Court in Maricopa County
The Honorable John Foreman, Judge (retired)

**AFFIRMED**

_____

TERRY GODDARD, ARIZONA ATTORNEY GENERAL                    Phoenix
     By   Kent E. Cattani, Chief Counsel, Capital
          Litigation Section
          Jeffrey A. Zick, Assistant Attorney General
Attorneys for State of Arizona

BRUCE PETERSON, ACTING LEGAL ADVOCATE                      Phoenix
     By   Thomas J. Dennis, Deputy Legal Advocate
Attorneys for Steve Alan Boggs

_____

**M c G R E G O R**, Chief Justice

¶1      On May 12, 2005, a jury determined that Steve Boggs
should receive the death penalty for the May 2002 murders of
Beatriz Alvarado, Kenneth Brown, and Fausto Jimenez.   In
accordance with Arizona Rule of Criminal Procedure 31.2(b),
appeal to this Court is automatic.   We exercise jurisdiction
pursuant to Article 6, Section 5.3 of the Arizona Constitution

and Arizona Revised Statutes (A.R.S.) section 13-4031 (2001).

## I.

## A.

¶2      On May 19, 2002, Alvarado, Brown, and Jimenez were working at a fast-food restaurant in Mesa, Arizona.[1]  After ten p.m., only the drive-through window was open.  At approximately 11:15 p.m., as Keith Jones drove toward the drive-through speaker to order food, he noticed an SUV in the parking lot behind the restaurant with a male in the driver's seat.  Jones saw three uniformed employees inside the store:  a Hispanic woman, a Hispanic man, and a Caucasian man.[2]

¶3      Luis Vargas arrived at the drive-through window between 11:30 and 11:45.  After waiting for ten minutes, Vargas yelled to get the attention of someone working at the restaurant and then heard Alvarado moaning.  He approached Alvarado, who was lying on the ground outside the restaurant's back door.  She told him in Spanish that "men entered," "they were robbing," and that she thought "they were still robbing."  Vargas backed away from the restaurant and called 911.

---

[1]    We view the facts in the light most favorable to upholding the jury's verdict.  *State v. Tucker*, 205 Ariz. 157, 160 n.1, 68 P.3d 110, 113 n.1 (2003).

[2]    According to Boggs, Christopher Hargrave, who is Caucasian and was also charged with the murders, was wearing his uniform when he entered the restaurant.

¶4      Police Officer Daniel Beutal, who responded to the 911 call, talked with Alvarado and understood her to mean that "bad people" might still be in the restaurant. From outside, Beutal could see Jimenez lying on the restaurant floor. Beutal called for backup and a K-9 unit. After other officers arrived, but before entering the restaurant, Beutal moved Alvarado away from the store to the paramedics. Beutal testified that Alvarado repeatedly asked for help; she subsequently died from two gunshots to her back.

¶5      Inside the restaurant, the police found Jimenez's body next to a telephone and found Brown's body in the freezer. Brown had died almost immediately from two gunshot wounds, one of which perforated his heart. Jimenez apparently had escaped from the freezer and, shortly after dialing 911, died from three gunshot wounds to his back.

¶6      The police found shell casings and bullet projectiles inside the freezer, evidencing that the perpetrators shot the victims there. Two cash registers were open and contained only coins, while the third register was closed but appeared as if someone had tried to pry it open. Approximately $300 had been taken from the registers. Police found a purse inside the office, but did not find a wallet for either Jimenez or Brown. Just after midnight on May 20, a man, later identified as

3

Christopher Hargrave, tried to use Jimenez's bank card at an ATM.

**¶7**     Hargrave, a friend of Boggs, had worked at the restaurant from April 19 to May 15, 2002. Boggs and Hargrave participated in a militia, the "Imperial Royal Guard," which focused on "uplifting" the white race and fostered negative views of minority groups. The Imperial Royal Guard consisted entirely of Boggs as Chief of Staff, Hargrave as Assistant Chief of Staff, and their girlfriends, Amy Willet and Gayle Driver.

**¶8**     Before the murders, Hargrave lived in a trailer on land belonging to his girlfriend's parents, Kay and William Driver. The Drivers allowed Hargrave to live there on the condition that he remain employed. In May 2002, Jimenez, an assistant manager in training at the restaurant, reported Hargrave for twice having a short register. When Hargrave subsequently was fired for the shortages, the Drivers asked him to leave their property.

**¶9**     The Drivers also knew Boggs, who often came into their pawn shop. On May 21, two days after the murders, Boggs took two guns, one of them a Taurus handgun, into the pawn shop to trade for a new gun. William Driver cleaned the Taurus, but placed it in his safe because he had a "feeling" about the transaction. Kay Driver later called police and told them about

4

the Taurus that Boggs had pawned. On June 3, Boggs and Hargrave each called the pawn shop and asked to buy back the Taurus.

¶10 The police recovered the gun from the Drivers and conducted several test firings. The State's criminalist concluded that all the shell casings and bullet fragments from the scene, as well as fragments removed from the bodies, were fired from the Taurus. DNA found on the Taurus came from at least three sources. The DNA matched Hargrave's profile at 14 locations; the DNA expert could not eliminate Boggs as a source.

¶11 On June 5, Mesa Detective Donald Vogel interrogated Boggs for approximately three hours. Boggs waived his *Miranda*[3] rights and agreed to answer questions. During the interview, Boggs told several versions of what happened on the day of, and the days following, the murders. Information gained in this interview led to the apprehension of Hargrave the following day.

¶12 On June 6, Detectives Kaufman and Price took Boggs to obtain his photograph, fingerprints, and DNA, and to transport him to his initial appearance. As the detectives secured the evidence, Boggs asked Kaufman how he could change the story he had told to Detective Vogel the previous day. En route to his initial appearance, Boggs asked Price how he could change his story. At the initial appearance, Boggs requested counsel,

---

[3]     *Miranda v. Arizona*, 384 U.S. 436 (1966).

which the judge appointed. Subsequently, while returning to jail, Boggs once more asked Kaufman with whom he needed to speak to change his story. Price telephoned Vogel and arranged to take Boggs to the interrogation room for further questioning. Once at the police station, after Boggs informed Detective Vogel that he wished to speak with him, Vogel read Boggs his *Miranda* rights and again interviewed him.

¶13 During the June 6 interview, Boggs first claimed that Hargrave committed all the crimes inside the restaurant and denied knowledge of Hargrave's actions at the time. In his next version of events, he admitted helping to plan a non-violent robbery, but maintained that he remained outside the store as a lookout during the robbery. A short while later, Vogel mentioned Boggs' infant son. When Vogel asked his son's name, Boggs repeated, "Just leave me alone," three times. After Vogel twice offered to leave the room, Boggs began discussing suicide.

¶14 Boggs then asked to speak with the prosecutor so that "he could assure me that I would at least in some way be able to still be with my son." Vogel responded that no one could make any promises to Boggs. Vogel also assured Boggs that, whether or not Boggs talked with him, Vogel would ask the jail to place Boggs in protective custody. After more than an hour of interrogation, Boggs confessed to playing an active role in the robbery and admitted shooting at the victims.

6

¶15    In January 2004, Boggs sent a letter to Detective Vogel detailing the order and manner in which the deceased employees fell to the ground and stating that he wished to speak with Vogel in person. Boggs also stated that his motivation for the murders was not pecuniary, but rather, based on race.

¶16    In June 2004, Boggs moved to represent himself. During the following months, the trial judge discussed several times the repercussions of proceeding in propria persona (pro per) and attempted to dissuade Boggs from doing so. The following September, the court granted his motion and appointed advisory counsel. While acting pro per, Boggs complained to the trial judge of interference by the Maricopa County Sheriff's Office (MCSO) with his self-representation. Specifically, Boggs claimed that the MCSO seized legal documents from his cell and refused to provide him items sent to the jail by his advisory counsel.

¶17    Meanwhile, Detective Vogel and the prosecutor received threatening letters, allegedly sent by Boggs. In response, the MCSO began searching Boggs' cell and confiscating items. After Vogel warned the MCSO employees not to proceed without a warrant, they moved Boggs to a different cell, replaced the items, and waited for a search warrant before resuming the search. A detective took the confiscated materials to a superior court judge who had been appointed as a special master

7

for the purpose of reviewing the items for relevance as to the warrant. The jail staff ultimately confiscated eighteen items and returned those items that the special master deemed improperly seized. The prosecutor did not see any of the privileged items confiscated during the search. Boggs' advisory counsel was informed of the special master's independent review, but declined to participate or review the seized items. Boggs alleged that certain legal documents, including discovery items, were never returned. The trial judge recommended that both parties review the property to determine what items, if any, may have been missing.

¶18 On March 23, 2005, Boggs filed a motion to dismiss based on the search and seizure of items from his cell. The trial judge addressed the issue on April 4, 2005, when Boggs told the judge that some items were still missing, including questions he had prepared for a voluntariness hearing scheduled for later that day. Boggs expressed concern that his missing questions could have been used to coach state witnesses. The prosecutor reminded the court that he had not seen any privileged items from the search. The judge concluded that nothing "untoward occurred" and stated that the hearing would continue as scheduled unless Boggs could show that a "substantial amount of materials were actually taken."

¶19     At the voluntariness hearing, the trial court addressed Boggs' motion to suppress all statements made in the June 5 and June 6 interrogations.  During the hearing, Boggs appears to have been expressing a *Miranda* objection, claiming that he had requested an attorney, and a voluntariness objection, pointing to the manner in which police detained him and transported him to the police station.  Detectives Heivilin, Price, and Vogel testified at the voluntariness hearing.  Heivilin testified that during his apprehension on June 5, Boggs did not request an attorney.  Price testified next about Boggs' June 6 request to speak with Vogel so that he could change the statements he made during the June 5 interrogation.  Vogel then testified regarding the interrogations themselves.  As to the June 6 interrogation, Vogel testified that Boggs initiated the contact with the police and that he read Boggs his *Miranda* rights.  Vogel also testified that he did not threaten Boggs, make any promises of leniency, or physically abuse Boggs during the ninety-minute interrogation.  At the close of the hearing, the trial court ruled that Boggs' statements were voluntary.

¶20     Also on April 4, Boggs' advisory counsel asked the trial judge to allow hybrid representation for voir dire.  The judge agreed, but warned that he would not permit hybrid representation during the trial.  He told Boggs that if he wanted, his advisory counsel could take over the trial, but that

9

"if they take over the trial, they are going to take over the trial." On April 11, 2005, after several days of jury selection, Boggs relinquished his right to proceed pro per. The trial court responded that this was a "wise move" and stated, "Just so we are clear on this, Mr. Boggs, we are not going [to] go back and forth on this."

**B.**

¶21 The guilt proceeding began on April 11, 2005. During the trial, the prosecution played videotapes of the June 5 and 6 interrogations and gave the jury transcripts to follow as they watched the video. The defense did not object. On May 3, 2005, at the close of the guilt proceeding, the jury found Boggs guilty of three counts of first degree murder.

¶22 The sentencing proceeding began on May 4, 2005. At the aggravation phase, the State presented no new evidence and the jury returned its verdicts the same day, finding three aggravating factors for each of the murders: expectation of pecuniary gain, under A.R.S. § 13-703.F.5; murders committed in an especially heinous, cruel or depraved manner, under § 13-703.F.6; and a conviction for one or more other homicides during the commission of the offense, under § 13-703.F.8.

¶23 On May 5, before the penalty phase, Boggs again moved to represent himself. The trial judge denied his motion, stating:

Mr. Boggs, I indicated to you earlier, we're not going to play ping-pong on this. You've indicated that you wanted Mr. Alcantar and Mr. Carr to represent you during the trial. I think that was a wise move. I do not think it would be a wise move to change.

And more importantly, the law indicates that this is not something that we can – we can't be changing horses in the mid-stream here.

When Boggs responded that he wished to "fire" his counsel, the court stated: "We've gone over that. You have a right to counsel. You've got counsel. We're at the very end of a long and difficult trial . . . . We're not going to be changing counsel here." The penalty phase continued on May 9, 2005.

¶24 During the penalty phase, the defense presented mitigation evidence concerning Boggs' troubled childhood and his mental health. At the close of the trial, the jury found Boggs' mitigation not sufficiently substantial to call for leniency and concluded that death was the appropriate sentence for each murder. *See* A.R.S. § 13-703.01.G-H.

**II.**

**A.**

¶25 Boggs first argues that the trial court violated his right to counsel by admitting the June 6 interview into evidence. We review constitutional issues de novo. *State v. Pandeli*, 215 Ariz. 514, 522 ¶ 11, 161 P.3d 557, 565 (2007).

¶26 The right to counsel attaches at "'critical' stages in the criminal justice process 'where the results might well

11

settle the accused's fate and reduce the trial itself to a mere formality.'" *Maine v. Moulton*, 474 U.S. 159, 170 (1985) (quoting *United States v. Wade*, 388 U.S. 218, 224 (1967)). When a defendant asserts this right, the state has an "affirmative obligation to respect and preserve the accused's choice to seek this assistance." *Id.* at 171. The state may not engage in further interrogation unless the accused initiates the communication and makes a voluntary, knowing, and intelligent waiver of his right to be silent. *See State v. Smith*, 193 Ariz. 452, 459 ¶ 29, 974 P.2d 431, 438 (1999).

¶27 Boggs asserted his Sixth Amendment right to counsel at the June 6 initial appearance. Subsequently, however, Boggs asked several times to speak with someone to change the story he had told Detective Vogel during the previous day's interrogation. Importantly, after Boggs asserted his right to counsel at the initial appearance, Boggs asked Detective Kaufman with whom he could speak to change his story and told Detective Vogel that he wanted to speak with him. Finally, at the beginning of the June 6 interrogation, Detective Vogel asked Boggs a series of questions to clarify that Boggs, rather than the detectives, initiated the conversation. Vogel again read Boggs his *Miranda* rights, and Boggs agreed to voluntarily answer Vogel's questions. Boggs thus initiated the communication with

12

the police, and Detective Vogel was not barred from conducting further interrogation.

¶28    Boggs argues that although he initiated contact by asking to change his story, the June 6 interview nonetheless violated his right to counsel.  He cites *State v. Hackman*, 189 Ariz. 505, 507-08, 943 P.2d 865, 867-68 (App. 1997), for the proposition that once counsel is appointed, counsel must be present for an accused to validly waive his Sixth Amendment rights.    But *Hackman*, unlike this case, involved contact initiated by the state's investigator rather than by the accused.  *Id.* at 506, 943 P.2d at 866.  Boggs also relies on a New York case which again involved a police-initiated interview. *See People v. Arthur*, 239 N.E.2d 537, 537-38 (N.Y. 1968).  We decline to hold that an accused cannot waive the right to counsel unless counsel is present when the accused himself initiates contact with the police.  We find no violation of Boggs' Sixth Amendment rights.

**B.**

¶29    Boggs next argues that the trial court violated his right to confront witnesses and his right to a fair trial by admitting that portion of the June 6 interview in which Detective Vogel confronted Boggs with statements allegedly made by Hargrave earlier that day.  Specifically, Vogel stated, "Chris told me that you did all the shootin' inside the store"

13

and "I'm just tellin' ya' that Chris told me that you were the one that went in the back cooler with everybody . . . and that you did all the shootin'."

¶30    Detective Vogel testified more than a week after the jury watched the interrogation video. During Vogel's testimony, both parties elicited statements from him to the effect that he had "more information" about the murders during the June 6 interview than he had during the June 5 interview. Vogel explained that this new information included information he received from Hargrave. On cross-examination, Vogel acknowledged that lying is a permissible interrogation technique. The defense did not request that the court instruct the jury that they could not use the statements attributed to Hargrave to prove the truthfulness of the assertions.

## 1.

¶31    We review de novo challenges to admissibility based on the Confrontation Clause. *State v. Tucker*, 215 Ariz. 298, 315 ¶ 61, 160 P.3d 177, 194 (2007). When a defendant fails to object to error at trial, we engage in fundamental error review. *State v. Henderson*, 210 Ariz. 561, 567 ¶ 19, 115 P.3d 601, 607 (2005). Fundamental error is limited to "error going to the foundation of the case, error that takes from the defendant a right essential to his defense, and error of such magnitude that the defendant could not possibly have received a fair trial." *State*

14

*v. Hunter*, 142 Ariz. 88, 90, 688 P.2d 980, 982 (1984). A defendant bears the burden of proving that fundamental error exists and that the error caused him prejudice. *Henderson*, 210 Ariz. at 567 ¶ 20, 115 P.3d at 607. Because Boggs did not object to the admission of the unredacted interview, we are limited to fundamental error review.

**¶32** The Confrontation Clause provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. The Confrontation Clause attaches to "testimonial witness statements made to a government officer to establish some fact." *State v. Roque*, 213 Ariz. 193, 214 ¶ 70, 141 P.3d 368, 389 (2006). The right is not violated, however, "by use of a statement to prove something other than the truth of the matter asserted." *State v. Smith*, 215 Ariz. 221, 229 ¶ 26, 159 P.3d 531, 539 (2007); *see also Roque*, 213 Ariz. at 214 ¶ 70, 141 P.3d at 389.

**¶33** In *Roque*, we addressed a similar situation that involved a trial court's admission of a videotaped interview in which a detective repeated statements allegedly made by a non-testifying witness against the defendant. 213 Ariz. at 213-14 ¶ 69, 141 P.3d at 388-89. There, we recognized the use of such statements as a valid interrogation technique and found no Confrontation Clause violation because the statements were used

15

merely as a method of interrogation and the jury was instructed that the statements could not be used to establish the truth of the matters asserted. *Id.* at 214 ¶ 70, 141 P.3d at 389.

¶34      Boggs attempts to distinguish his case from *Roque*, in which the prosecution did not present any evidence to establish the truth of the out-of-court statements repeated by the detective. *Id.* Here, Boggs argues, Detective Vogel suggested the truthfulness of Hargrave's statements when he testified at trial that he "had more information with which to confront Mr. Boggs" at the June 6 interview, including information from Hargrave. On the other hand, the State did not present the jury with any direct testimony as to the truthfulness of the statements, did not seek to introduce a transcript of Hargrave's interrogation into evidence, and did not rely on the statements as substantive evidence. Furthermore, on cross-examination, Detective Vogel testified that lying is a permissible interrogation technique.

¶35      Had Boggs objected at trial, he might well have been entitled to an instruction that the statements attributed to Hargrave were introduced as part of the interrogation and could not be used to prove the truth of the matters asserted. But because the statements were admissible at least for the limited purpose of showing the context of the interrogation, Boggs cannot demonstrate fundamental error.

16

**2.**

¶36    Boggs also asserts that Vogel's testimony about Hargrave's statements violated his right to a fair trial because the judge did not instruct the jury that the statements were untrue.  The defense, however, not only failed to object to the admission of the June 6 interview, but also failed to request that the judge give such a limiting instruction.  The trial judge's failure to provide a limiting instruction sua sponte was not fundamental error.

**C.**

¶37    During the June 5 and June 6 interrogations, Detective Vogel repeatedly accused Boggs of lying.  The State played the June 5 and 6 interrogation videos for the jury without redacting any portions in which Detective Vogel accused Boggs of lying.  Boggs did not object or request a limiting instruction.  Boggs now argues that the admission of the unredacted interrogations violated his right to a fair trial.

¶38    We review a trial court's evidentiary rulings for abuse of discretion.  *Tucker*, 215 Ariz. at 314 ¶ 58, 160 P.3d at 193.  When the alleged error is based on a constitutional or legal issue, we review the issue de novo.  *Pandeli*, 215 Ariz. at 522 ¶ 11, 161 P.3d at 565.  Because Boggs failed to object, our review is limited to fundamental error.  *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

17

¶39       Arizona prohibits lay and expert testimony concerning the veracity of a statement by another witness.  *State v. Moran*, 151 Ariz. 378, 382, 728 P.2d 248, 252 (1986) (expert witness); *State v. Reimer*, 189 Ariz. 239, 240-41, 941 P.2d 912, 913-14 (App. 1997) (lay witness).  Determining veracity and credibility lies within the province of the jury, and opinions about witness credibility are "nothing more than advice to jurors on how to decide the case."  *Moran*, 151 Ariz. at 383, 728 P.2d at 253. The issue of whether a videotaped interrogation that includes accusations of a defendant's untruthfulness can be admitted, however, is one of first impression in Arizona.

¶40       Because Vogel's accusations were part of an interrogation technique and were not made for the purpose of giving opinion testimony at trial, we find no fundamental error. Decisions from other states buttress our conclusion.  *See State v. Cordova*, 51 P.3d 449, 455 (Idaho Ct. App. 2002) (allowing such statements by interrogating officers at trial "to the extent that they provide context to a relevant answer by the suspect"); *Lanham v. Commonwealth*, 171 S.W.3d 14, 27-28 (Ky. 2005); *State v. O'Brien*, 857 S.W.2d 212, 221-22 (Mo. 1993); *State v. Demery*, 30 P.3d 1278, 1284 (Wash. 2001) (plurality opinion); *see also Dubria v. Smith*, 224 F.3d 995, 1001 (9th Cir. 2000) (concluding, in the context of reviewing a denial of habeas corpus, that an officer's statements simply gave context

18

to the defendant's answers). *But see State v. Elnicki*, 105 P.3d 1222, 1229 (Kan. 2005) (holding that an officer's statements in a videotaped interrogation are inadmissible opinion evidence and noting that "context" for a defendant's shifting stories could be shown in other ways); *Commonwealth v. Kitchen*, 730 A.2d 513, 521 (Pa. Super. Ct. 1999) (analogizing an interviewer's statements regarding a defendant's truthfulness to a prosecutor's inadmissible personal opinion as to the defendant's guilt).

¶41    *Lanham*, one of the most recent cases to address this issue, noted that "[a]lmost all of the courts that have considered the issue recognize that this form of questioning is a legitimate, effective interrogation tool.  And because such comments are such an integral part of the interrogation, several courts have noted that they provide a necessary context for the defendant's responses."  *Lanham*, 171 S.W.3d at 27.  The court concluded that "such recorded statements by the police during an interrogation are a legitimate, even ordinary, interrogation technique, especially when a suspect's story shifts and changes."  *Id.*  The court also stated that because the statements are not admissible to prove that the suspect was lying, courts should provide the jury with a limiting instruction if one is requested.  *Id.* at 27.

19

¶42    We agree that, if Boggs had requested a limiting instruction, one would have been appropriate, but Boggs neither objected to the evidence nor requested a limiting instruction. In addition, Boggs cannot establish prejudice because he did, in fact, provide multiple stories about his involvement; the jury did not need Vogel's comments to know that Boggs lied. Boggs has not established fundamental error.

## D.

¶43    Boggs next argues that all the statements he made to Detective Vogel after he said "[J]ust leave me alone" and mentioned suicide were involuntary and therefore inadmissible. We review a trial court's ruling on the admissibility of a defendant's confession for abuse of discretion. *State v. Ellison*, 213 Ariz. 116, 126 ¶ 25, 140 P.3d 899, 909 (2006).

¶44    Only voluntary statements made to law enforcement officials are admissible at trial. *Id.* at 127 ¶ 30, 140 P.3d at 910. A defendant's statement is presumed involuntary until the state meets its burden of proving that the statement was freely and voluntarily made and was not the product of coercion. *State v. Arnett*, 119 Ariz. 38, 42, 579 P.2d 542, 546 (1978). The state meets its burden "when the officer testifies that the confession was obtained without threat, coercion or promises of immunity or a lesser penalty." *State v. Jerousek*, 121 Ariz. 420, 424, 590 P.2d 1366, 1370 (1979). In determining whether a

20

confession is voluntary, we consider whether the defendant's will was overcome under the totality of the circumstances. *State v. Newell*, 212 Ariz. 389, 399 ¶ 39, 132 P.3d 833, 843 (2006). To find a confession involuntary, we must find both coercive police behavior and a causal relation between the coercive behavior and the defendant's overborne will. *Colorado v. Connelly*, 479 U.S. 157, 165-66 (1986). In this case, the court did not abuse its discretion in ruling the statements voluntary.

¶45 Boggs alleges that Vogel employed psychological pressure to provoke his confession by preying on his love for his son. He analogizes this case to *United States v. Tingle*, 658 F.2d 1332 (9th Cir. 1981), which held that police statements were patently coercive because they implied that a mother might not see her child for a long time unless she cooperated with police. *Id.* at 1336.

¶46 Any analogy to *Tingle* is strained. Unlike the agents in *Tingle*, Detective Vogel did not threaten Boggs with the loss of his child. Rather, Vogel attempted to solicit a sense of responsibility for his son to encourage Boggs to "tell the truth," not to intimate that Boggs would never see his son if he did not cooperate. When Boggs was unresponsive to Vogel's question regarding his son's name, Vogel responded, "[Y]ou don't have to talk about the boy," and changed the subject. In fact,

although Boggs brought up his son later in the conversation, Vogel refrained from further conversation regarding Boggs' son. Also, Boggs did not confess in direct response to Vogel's comments about his son, demonstrating that these comments did not overcome his will.

¶47    Although his argument is not clear, Boggs also seems to argue that the statements must be excluded because Vogel coerced him when he did not cease questioning after Boggs stated, "Just leave me alone." *Miranda* requires that when an "individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74. If the alleged assertion of the right to silence is ambiguous, or "susceptible to more than one interpretation, the limit of permissible continuing interrogation immediately after the assertion would be for the sole purpose of ascertaining whether the defendant intended to invoke his right to silence." *State v. Finehout*, 136 Ariz. 226, 229, 665 P.2d 570, 573 (1983); *see State v. Flower*, 161 Ariz. 283, 287, 778 P.2d 1179, 1183 (1989) ("[B]y failing to at least clarify [the defendant's] intent, [the detective] did not 'scrupulously honor' [the defendant's] right to silence, and the entire statement was inadmissible as a violation of *Miranda*.").

22

¶48	When Boggs stated, "Just leave me alone," Vogel did not ignore the statement, but instead offered to leave him alone by asking, "Do you want me to walk out for a few minutes?" and stating, "If you want me to leave the room, tell me."  These comments attempted to clarify whether Boggs wanted Vogel to end the interrogation or merely to stop discussing his son.  Instead of responding in the affirmative, Boggs stated that the police were going to kill him anyway and they "might as well just get it over with now."  Boggs then continued talking with Vogel.  Vogel did not engage in coercive behavior by clarifying the meaning of Boggs' statements and responding to Boggs' further comments.

¶49	Under the totality of the circumstances, Boggs' statements were voluntary.  Vogel neither threatened Boggs nor made him any promises.  Indeed, Vogel made clear to Boggs that he could not make any promises and was only looking for the truth.  Boggs presented no evidence of coercive behavior.

**E.**

¶50	Boggs next argues that the MCSO's failure to return some of the documents seized from his cell violated his constitutional right to keep confidential pretrial preparations and attorney-client communications and required the court to grant his motion to dismiss.  We review de novo alleged violations of a defendant's Sixth Amendment right to counsel,

23

*State v. Glassel*, 211 Ariz. 33, 50 ¶ 59, 116 P.3d 1193, 1210 (2005), but review a ruling on a motion to dismiss for abuse of discretion, *State v. Moody*, 208 Ariz. 424, 448 ¶ 75, 94 P.3d 1119, 1143 (2004).

¶51    The Sixth Amendment and Article 2, Section 24 of the Arizona Constitution guarantee criminal defendants the right to counsel, *State v. Warner*, 150 Ariz. 123, 127, 722 P.2d 291, 295 (1986), but "not every intrusion into the attorney-client relationship results in a denial of effective assistance of counsel.  Whether a Sixth Amendment violation exists depends on whether the intrusions were purposeful and whether the prosecution, either directly or indirectly, obtained evidence or learned of defense strategy from the intrusions."  *State v. Pecard*, 196 Ariz. 371, 377 ¶ 28, 998 P.2d 453, 459 (App. 1999) (citing *Weatherford v. Bursey*, 429 U.S. 545, 558 (1977)).

¶52    In *Warner*, this Court addressed an argument similar to that made by Boggs.  *See* 150 Ariz. at 125-28, 722 P.2d at 293-96.  Jail personnel had seized all papers from Warner's cell in an attempt to secure evidence of alleged perjury.  *Id.* at 125, 722 P.2d at 293.  Jail staff returned the seized papers, including transcripts and summaries of conferences between the defendant and his counsel, to the defendant but provided copies to the prosecutor.  *Id.*  The prosecutor's assistant read the materials, and the prosecutor read some of the materials.  *Id.*

24

at 126, 722 P.2d at 294. Because the prosecutor viewed the privileged materials, we found a presumptive violation of the defendant's right to counsel. *Id.* at 127, 722 P.2d at 295.

¶53 Boggs' case differs from *Warner*, however, because the prosecutor here never received or reviewed any privileged items. In fact, the State protected the defendant's right to counsel by requesting that a special master review the seized materials and return any privileged items to Boggs. The trial court then held evidentiary hearings to address the alleged violation of Boggs' right to counsel. At the hearings, the court found the testimony of two MCSO officers and Detective Vogel credible and concluded that nothing "untoward occurred."

¶54 Thus, unlike the defendant in *Warner*, Boggs failed to show improper interference with his right to counsel. *See Moody*, 208 Ariz. at 448 ¶ 77, 94 P.3d at 1143 ("The defendant bears the initial burden to establish an interference in the attorney-client relationship.").

**F.**

¶55 At the guilt phase, Luis Vargas and Officer Beutal testified to Alvarado's statements on the night of the murders. Boggs contends that the admission of Alvarado's statements violated his Sixth Amendment right to confrontation. Although we usually review de novo Confrontation Clause challenges, *Tucker*, 215 Ariz. at 315 ¶ 61, 160 P.3d at 194, because Boggs

25

failed to object below, he must show fundamental error, *Henderson*, 210 Ariz. at 567 ¶ 19, 115 P.3d at 607.

¶56    The Confrontation Clause applies only to testimonial evidence. *Crawford v. Washington*, 541 U.S. 36, 51 (2004). *Crawford* defined testimony as "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact." *Id.* The Court clarified "testimonial" in *Davis*:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Davis v. Washington*, 126 S. Ct. 2266, 2273-74 (2006); *see also id.* at 2279 (finding statements non-testimonial when declarant "was seeking aid, not telling a story about the past").

¶57    The admission of Alvarado's statements did not violate Boggs' right to confrontation. As she lay dying on the ground just outside the restaurant, Alvarado told Vargas that "men entered," "they were robbing," and that she thought "they were still robbing." When Officer Beutal arrived, she told him that two people were in the store and repeatedly asked him for help.

¶58    The circumstances in which Alvarado made the statements indicate that she was seeking aid for herself and the

26

others inside the store to meet an ongoing emergency. Further, the officers' actions, including surrounding the restaurant and sending dogs in to confront anyone still inside the restaurant, demonstrate that they understood the situation to be an ongoing emergency. *See State v. Alvarez*, 213 Ariz. 467, 473 ¶ 19, 143 P.3d 668, 674 (App. 2006) (finding an "ongoing emergency" when facts indicate that "[a]lthough the criminal activity . . . had ended, the emergency that those events set in motion was very much ongoing"). Because Alvarado's statements described what appeared to be an ongoing emergency, they were non-testimonial.

**G.**

**¶59** Boggs raises two arguments with respect to the sentencing proceeding. First, he argues that the trial court abused its discretion by denying his motion to proceed pro per at the penalty phase.[4] *See State v. De Nistor*, 143 Ariz. 407, 413, 694 P.2d 237, 243 (1985) (stating that a trial court maintains discretion to deny an untimely motion for self-representation). The right to proceed without counsel is not unqualified, but must be balanced against the government's right to a "'fair trial conducted in a judicious, orderly fashion.'" *De Nistor*, 143 Ariz. at 412, 694 P.2d at 242 (quoting *United States v. Dujanovic*, 486 F.2d 182, 186 (9th Cir. 1973)).

---

[4] Boggs moved to proceed pro per in the middle of the sentencing proceeding, before the start of the penalty phase.

27

¶60    A defendant who exercises the right to self-representation can subsequently waive that right, either explicitly or implicitly. *See, e.g.*, *McKaskle v. Wiggins*, 465 U.S. 168, 182 (1984). In this case, Boggs relinquished his right to proceed pro per on April 11, 2005, despite the trial judge's warning that "if [advisory counsel] take over the trial, they are going to take over the trial." The judge further cautioned, "[W]e are not going [to] go back and forth on this."

¶61    When a defendant has waived his right to self-representation, the trial court may exercise its discretion in deciding whether to permit or deny a subsequent attempt to proceed pro per. *See United States v. Singleton*, 107 F.3d 1091, 1099 (4th Cir. 1997) (stating that if a defendant has waived the right to self-representation, "[t]he decision at that point whether to allow the defendant to proceed *pro se* at all or to impose reasonable conditions on self-representation rests in the sound discretion of the trial court"). The nature of the right to self-representation does not "suggest[] that the usual deference to 'judgment calls' . . . by the trial judge should not obtain here." *McKaskle*, 465 U.S. at 177 n.8; *see also State v. Cornell*, 179 Ariz. 314, 326, 878 P.2d 1352, 1364 (1994) (recognizing that self-representation is not an absolute right and stating that "the court need not stop the trial for the convenience of the defendant each time he changes his mind").

28

¶62     Before Boggs decided to relinquish his right of self-representation, the trial judge cautioned that if Boggs wished to have appointed counsel take over his representation, counsel would remain in that position for the remainder of the trial. When Boggs relinquished his right to self-representation and thereby waived his right to proceed pro per, the judge again gave a similar warning.  When the trial court denied Boggs' second motion to represent himself, it reminded Boggs of its previous warnings and stated that it would not go back and forth on the issue.  Because Boggs had relinquished the right to self-representation, the trial judge did not abuse his discretion in denying Boggs' second request to represent himself.

**H.**

¶63     Finally, Boggs argues that the trial court violated his due process right to a fair trial by allowing the State to present threatening letters as rebuttal evidence in the penalty phase.  We review a trial court's evidentiary rulings at the penalty phase for abuse of discretion, *State v. McGill*, 213 Ariz. 147, 156 ¶ 40, 140 P.3d 930, 939 (2006), but review constitutional issues de novo, *id.* at 159 ¶ 53, 140 P.3d at 942.

**1.**

¶64     Arizona's sentencing scheme provides:

> At the penalty phase, the defendant and the state may present any evidence that is relevant to the determination of whether there is mitigation that is

29

> sufficiently substantial to call for leniency. In order for the trier of fact to make this determination, the state may present any evidence that demonstrates that the defendant should not be shown leniency.

A.R.S. § 13-703.01.G. Relevant information is admissible at sentencing "regardless of its admissibility under the rules governing admission of evidence at criminal trials." A.R.S. § 13-703.C. Both parties are also "permitted to rebut any information received" at the penalty phase. A.R.S. § 13-703.D.

**¶65** Evidence presented for rebuttal must be relevant to the mitigation proffered. A.R.S. § 13-703.C; *Roque*, 213 Ariz. at 220 ¶ 107, 141 P.3d at 395. Relevant means "'tending to prove or disprove the matter at issue,' a standard virtually identical to that employed in Rule 401 of the Arizona Rules of Evidence." *Roque*, 213 Ariz. at 220-21 ¶ 107, 141 P.3d at 395-96 (quoting *McGill*, 213 Ariz. at 157 ¶ 40, 140 P.3d at 940). While we give "deference to a trial judge's determination of whether rebuttal evidence offered during the penalty phase is 'relevant' within the meaning of the statute," *McGill*, 213 Ariz. at 156-57 ¶ 40, 140 P.3d at 939-40, "[t]rial courts can and should exclude evidence that is either irrelevant to the thrust of the defendant's mitigation or otherwise unfairly prejudicial," *State v. Hampton*, 213 Ariz. 167, 180 ¶ 51, 140 P.3d 950, 963 (2006).

**¶66** We agree that the threatening letters are relevant to rebut mitigation testimony. The thrust of the mitigation was

30

that Boggs suffers from mental health issues, including bipolar disorder. To support the diagnosis, two mental health experts, Drs. Ruiz and Lanyon, testified about Boggs' delusional involvement in a militia and suggested that, because the militia was a delusion, Boggs could not cause any harm through the entity. Dr. Ruiz stated that although she had no knowledge to confirm or disaffirm the militia's existence, she believed Boggs' militia activities to be delusional. When the State questioned Dr. Lanyon about the concrete manifestations of the current militia, including uniforms and weapons, he responded: "That to me seemed to support the delusional aspects of this that he was – had a big organization that was going to shake up the world or something, going to put bombs in, you know." Boggs' letters that threatened harm for mistreating the leader of the militia rebut the suggestion that Boggs' militia involvement was benign.

¶67        Boggs further argues that even if the letters are relevant, they are too prejudicial, relying on language from *State v. Hampton*. In *Hampton*, the prosecution offered bad acts evidence to rebut mitigation testimony that Hampton was a "caring person who deserved leniency." *Id.* at 179 ¶ 47, 140 P.3d at 962. We concluded that the bad acts evidence was admissible, but recognized that our death penalty statutes do not "strip[] courts of their authority to exclude evidence in the penalty

31

phase if any probative value is substantially outweighed by the prejudicial nature of the evidence. Trial courts should not allow the penalty phase to devolve into a limitless and standardless assault on the defendant's character and history." *Id.* at 180 ¶ 51, 140 P.3d at 963. The language that Boggs relies on, however, does not extend to the circumstances before us because here the threatening letters were not offered to show Boggs' bad character. The trial court therefore did not abuse its discretion in admitting them.

## 2.

¶68 Rebuttal evidence in the mitigation phase must comport not only with Arizona's sentencing scheme, but also with the requirements of the Due Process Clause. *Hampton*, 213 Ariz. at 179 ¶ 48, 140 P.3d at 962. Although the sentencing process does not require the same procedural safeguards as does the guilt phase of a trial, *Gardner v. Florida*, 430 U.S. 349, 358 n.9 (1977), testimonial hearsay presented at sentencing must be "accompanied by sufficient indicia of reliability," *McGill*, 213 Ariz. at 160 ¶ 57, 140 P.3d at 943. Boggs asserts that the letters did not contain sufficient indicia of reliability to comply with due process.

¶69 Introduction of the letters at the penalty phase did not violate due process. As a primary matter, the threatening letters in this case were neither hearsay nor testimonial.

32

Furthermore, Boggs knew of the threatening letters before the trial started, as he successfully kept them out of the guilt phase. Yet, Boggs failed to object on foundational grounds at the sentencing hearing. When the trial judge specifically asked the defense if it objected to the foundation of the evidence, the defense responded in the negative. On cross-examination, the defense questioned the reliability of the threatening letters by comparing the handwriting with another letter signed by Boggs and noting that one of the letters contained no evidence that it was sent from jail. Thus, the defense did address the letters' reliability before the jury, but did not object to their foundation.

¶70     Boggs now asserts that the threatening letters are not reliable because the State provided insufficient proof that he wrote them. This argument is not persuasive. First, nearly identical letters were sent to the lead detective and to the prosecutor. Second, Boggs' militia title was "Chief of Staff," and the letters specifically referred to the "Chief." Third, jail staff intercepted one of the letters, which an inmate stated that Boggs had asked him to mail. Finally, the letters stated, "we know where you live," and Boggs possessed an address for Vogel. The introduction of the threatening letters at the penalty phase did not violate Boggs' due process rights.

**III.**

¶71        Because the murders occurred before August 1, 2002, we independently review the aggravating and mitigating factors and the "propriety of the death sentence."  A.R.S. § 13-703.04.A; *see also State v. Roseberry*, 210 Ariz. 360, 373 ¶ 77, 111 P.3d 402, 415 (2005) ("[The Court] independently determines 'if the mitigation is sufficiently substantial to warrant leniency in light of existing aggravation.'" (citation omitted)).

## A.

¶72        The State alleged the existence of three aggravating factors for each of the murders.  We address each in turn.

## 1.

¶73        A defendant convicted of first degree murder is eligible for the death penalty if the state proves beyond a reasonable doubt that he "committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value."  A.R.S. § 13-703.F.5.  This aggravating factor is present "if the expectation of pecuniary gain is a motive, cause, or impetus for the murder and not merely a result of the murder."  *State v. Hyde*, 186 Ariz. 252, 280, 921 P.2d 655, 683 (1996).

¶74        The evidence allowed the jury to find the pecuniary gain aggravator beyond a reasonable doubt.  Boggs' June 6 confession clearly indicated his monetary motivation:  Boggs told Detective Vogel that money was his motivation and that the

34

incident happened "[b]ecause of the money." Moreover, the evidence demonstrated that money was taken from two registers; that someone attempted to pry open a third register; that the victims' pockets were emptied and wallets taken; and that one victim's bank card was used in an attempt to withdraw money from an ATM.

¶75    Boggs urges that the pecuniary gain aggravating factor is lacking because the evidence indicates multiple motivations for the murders, including a desire to silence witnesses and racist beliefs. Silencing witnesses so that none survive the robbery, however, is an act in furtherance of the robbery and thus supports a finding of the pecuniary gain aggravating factor. *See State v. Hoskins*, 199 Ariz. 127, 147 ¶ 87, 14 P.3d 997, 1017 (2000) ("When a robbery victim is executed to facilitate the killer's escape and hinder detection for the purpose of successfully procuring something of value, the pecuniary gain motive is present."). Moreover, because pecuniary gain need only be a motive or cause of the murder, *see Hyde*, 186 Ariz. at 280, 921 P.2d at 683, the fact that Boggs may have had other motives does not mean that the State failed to prove this aggravator.

**2.**

¶76    A defendant who commits first degree murder in "an especially heinous, cruel or depraved manner," is eligible for

35

the death penalty. A.R.S. § 13-703.F.6. The state need prove the existence of only one of these elements to establish this aggravating factor. *Tucker*, 215 Ariz. at 321 ¶ 103, 160 P.3d at 200. To show that a defendant committed a murder in an especially cruel manner, the state must show beyond a reasonable doubt that the victim suffered mental or physical distress. *Ellison*, 213 Ariz. at 141-42 ¶ 119, 140 P.3d at 924-25. The defendant must also "intend that the victim suffer or reasonably foresee that there is a substantial likelihood that the victim will suffer as a consequence of the defendant's acts." *State v. McCall*, 139 Ariz. 147, 161, 677 P.2d 920, 934 (1983).

¶77 We conclude that the State proved beyond a reasonable doubt that the victims suffered mental anguish sufficient to render the murders especially cruel. Mental anguish requires evidence that the victim "was conscious during the infliction of violence." *State v. Van Adams*, 194 Ariz. 408, 420 ¶ 44, 984 P.2d 16, 28-29 (1999). Moreover, the state can prove mental anguish by showing that a victim experienced "significant uncertainty about his or her ultimate fate." *Tucker*, 215 Ariz. at 311 ¶ 33, 160 P.3d at 190.

¶78 Boggs unsuccessfully attempts to analogize his case to *State v. Soto-Fong*, which involved the murder of three individuals in a store. 187 Ariz. 186, 190, 928 P.2d 610, 614 (1996). In *Soto-Fong*, the record lacked evidence demonstrating

36

what occurred between the time the defendant entered the store and the time that he killed the victims. *Id.* at 204-05, 928 P.2d at 628-29. In addition, only inconclusive evidence suggested that the victims suffered. *Id.* at 205, 928 P.2d at 629. In contrast, Boggs described the murders in detail during both the June 5 and June 6 interrogations. Boggs admitted that the victims were forced at gunpoint to lie down in the work area of the restaurant, ordered to remove everything from their pockets, ordered to march through the cooler into the back freezer with their hands interlaced on top of their heads, forced to kneel down, and then shot in rapid succession. Boggs also stated that after he and Hargrave left the victims in the freezer, he heard screaming, at which point he returned to the freezer and shot some more. Physical evidence corroborates Boggs' statements. The State thus presented sufficient evidence to establish the especially cruel aggravator for all three of the victims.[5]

### 3.

¶79    A defendant is death eligible if he "has been convicted of one or more other homicides . . . committed during the commission of the offense." A.R.S. § 13.703.F.8. This

---

[5]    Because the especially cruel aggravator requires only mental or physical suffering, *see Ellison*, 213 Ariz. at 141-42 ¶ 119, 140 P.3d at 924-25, we need not determine whether the evidence also shows physical suffering.

aggravator applies if "the defendant was found criminally liable, even if he himself did not physically commit the murders." *Ellison*, 213 Ariz. at 143 ¶ 129, 140 P.3d at 926. To establish the aggravator, we evaluate "the temporal, spatial, and motivational relationships between the capital homicide and the collateral [homicide], as well as . . . the nature of that [homicide] and the identity of its victim." *State v. Lavers*, 168 Ariz. 376, 393-94, 814 P.2d 333, 350-51 (1991) (alterations in original) (citations omitted); *see Ellison*, 213 Ariz. at 143 ¶ 128, 140 P.3d at 926 (requiring the murders be "part of a continuous course of criminal conduct").

¶80     Boggs concedes the temporal and spatial relationship among the victims, but argues that the homicides lack a motivational relationship. With regard to the various motivations, Boggs asserts that Hargrave shot one of the victims because he caused Hargrave to lose his job at the restaurant. Boggs also suggests that he participated in the shooting only because he was "flipping out upon seeing the victims after Hargrave shot them." Then he suggests that one of the killings was based on race and another was to eliminate a witness.

¶81     Regardless of Boggs' specific motive for committing the murders, all the murders involved a continuous course of criminal conduct. The evidence, including Boggs' admission from his June 6 interrogation, demonstrates that the victims were

38

killed, at least in part, as a means of witness elimination so that they could not identify the perpetrators. Boggs also stated that the victims were shot in the freezer to lessen the gunshot noise and avoid detection. This evidences that the murders were intended to prevent detection of the perpetrators, as part of a continuous course of criminal conduct.

¶82 Additionally, other alleged potential motivations apply to all the victims. First, the racial motivation applied to all the victims. Although Kenneth Brown was Native American and Alvarado and Jimenez were Hispanic, Boggs confessed to the killings in his January 2004 letter to Vogel and stated that his motive was "to rid the world of a few needless, illegals." Because Boggs' confession does not distinguish among the victims based on their race, any attempted distinction now seems disingenuous.

¶83 Second, Boggs contends that Hargrave shot one of the victims because he informed the restaurant manager of Hargrave's short drawer, resulting in Hargrave losing his employment. Hargrave, however, was angry not merely about being fired, but also about what he perceived to be disparate treatment between him and the "Mexican" employees with regard to discipline and salary. The record indicates that Hargrave did not distinguish among the employees based on their specific minority heritage. As a result, any race-based motive or motive related to

Hargrave's animosity toward the restaurant applies to all the victims. Because the murders were motivationally related and Boggs concedes the temporal and spatial relationship, the State established this aggravator beyond a reasonable doubt.

**B.**

¶84 A capital defendant may present any relevant evidence during the penalty phase so long as it "supports a sentence less than death." *Tucker*, 215 Ariz. at 322 ¶ 106, 160 P.3d at 201. The defendant must prove mitigating circumstances by a preponderance of the evidence. A.R.S. § 13-703.C. Boggs suggests three mitigating circumstances: difficult upbringing; mental illness; and cooperation with the police in apprehending Hargrave.

**1.**

¶85 Boggs presented sufficient evidence during the penalty phase to establish his difficult childhood by a preponderance of the evidence. Boggs' aunt testified that Boggs was born with a cleft palate that required numerous surgeries at an early age and led to emotional problems. Dr. Ruiz explained that constant hospitalizations and numerous surgeries during the developmental stages of Boggs' life affected his later functioning, causing him to be dissociated and delusional.

¶86 Boggs' aunt also testified that his mother abused him mentally and practiced "extreme discipline," although she never

abused him physically. She explained that Boggs' mother was diagnosed as having mental retardation and did not know how to parent. Boggs developed behavioral problems and, from the ages of ten to fifteen, spent significant time in group homes. Boggs' mitigation testimony also included allegations of sexual abuse between the ages of ten and fourteen, once involving another boy in a group home and once involving a police officer. Additionally, Boggs' aunt recalled him talking of suicide from the age of ten. Boggs was hospitalized for at least one suicidal episode.

¶87 Boggs' difficult life extended into his early adulthood, as most of his immediate family died when he was between the ages of sixteen and twenty-one. His maternal grandmother died of liver failure in 1996, his mother died of cancer in 1997, his sister died of an epileptic seizure in 1998, his brother committed suicide in 1998, and his maternal grandfather died of cancer in 1999.

## 2.

¶88 The defense also presented evidence sufficient to establish Boggs' mental health mitigating circumstance by a preponderance of the evidence. Dr. Ruiz testified about his traumatic life events and diagnosed Boggs with post-traumatic stress disorder (PTSD) and bipolar disorder based on his medical records. She explained that, with PTSD, "there are rare

instances where somebody . . . is reminded of [a past traumatic experience] because of an event that occurs in their lifetime, and they go into a [dissociative] state." Dr. Ruiz also explained that bipolar individuals suffer mood shifts from extremely depressed to manic or hypo-manic states, bypassing "normalcy." In a manic state, she said, "[e]ventually you rev up so fast, that you become psychotic" and disinhibited. Dr. Ruiz could not, however, offer an opinion as to whether Boggs was in a dissociative or manic state at the time of the murders.

¶89    Dr. Lanyon, a forensic psychologist, evaluated Boggs several times and concluded that he suffered from chronic bipolar disorder. Dr. Lanyon explained that delusions are a symptom of bipolar disorder and testified that "to a reasonable degree of psychological certainty" Boggs suffered from bipolar disorder at the time of the crimes, but stated: "That doesn't necessarily mean that his behavior on that day was driven by it. That means that his life up to that point . . . was heavily colored by it." Like Dr. Ruiz, Dr. Lanyon could not determine whether Boggs was in a manic state when he committed the crimes and even testified that it seemed "reasonably clear" that, at the time of the murders, Boggs was not doing the "out of control impulsive things" typical of a manic state. On the other hand, Dr. Lanyon testified that he believed Boggs was affected by his disorder at the time, particularly with regard to Boggs'

42

motivations for committing the crimes. In addition, Dr. Lanyon stated that delusions are a symptom of bipolar disorder and that Boggs' belief in his militia supported the delusional aspects of his mental health. He testified that Boggs may have been delusional at the time of the crimes, but not in a manic state.

¶90        In rebuttal, the State's expert, Dr. Almer, testified that although Boggs exhibited characteristics of anti-social, narcissistic, and borderline personality disorders, he was not bipolar. Dr. Almer suggested that Boggs was exaggerating his mental illness when Lanyon performed psychological tests on him, but testified that Boggs did have traits typical of a sociopath, which include a lack of "appreciation for the rights of other people [and] empathy for the misery of mankind, except to create [misery] for mankind." The evidence thus conflicts as to whether Boggs was bipolar or only anti-social. Taking all the evidence into account, the defense established that Boggs suffered from mental health issues, but could not establish his mental state at the time of the crimes.

### 3.

¶91        Boggs also argues on appeal that we should consider his voluntary assistance in helping the police capture Hargrave as mitigation. The defense contends that Boggs' assistance led to the peaceful apprehension of a dangerous man in a potentially violent situation.

¶92     Boggs did aid in the apprehension of Hargrave, but his motives for doing so are unclear.  As the State points out, Boggs may have provided the police with this information for his own benefit.  Indeed, because Boggs then blamed the robbery and murders completely on Hargrave, it was in his best interest for the police to capture Hargrave.  Boggs' cooperation with the police to aid in Hargrave's apprehension is entitled to minimal weight.  *See State v. Doerr*, 193 Ariz. 56, 70 ¶ 67, 969 P.2d 1168, 1182 (1998) (giving little weight, if any, to cooperation as a mitigating circumstance if defendant is "motivated by self-interest").

## C.

¶93     After evaluating each aggravating and mitigating factor, we independently review the propriety of the death sentence.  A.R.S. § 13-703.04.A.  In our independent reweighing of the evidence, we consider the "quality and the strength, not simply the number, of aggravating and mitigating factors." *State v. Greene*, 192 Ariz. 431, 443 ¶ 60, 967 P.2d 106, 118 (1998).  Because the State proved three aggravating factors, of which the multiple murders aggravating factor receives "extraordinary weight," *Hampton*, 213 Ariz. at 185 ¶ 90, 140 P.3d at 968, we must determine whether Boggs' mitigating evidence is "sufficiently substantial to warrant leniency," A.R.S. § 13-703.04.B.

44

**¶94**       Boggs' mitigation evidence involves primarily his difficult upbringing and poor mental health.  In our reweighing, we consider a difficult childhood and poor mental health as mitigating factors, whether or not they are causally related to the murder.  The existence or lack of a causal link, however, aids us in "assessing the quality and strength of the mitigation evidence." *State v. Johnson*, 212 Ariz. 425, 440 ¶ 65, 133 P.3d 735, 750 (2006) (citation omitted).  As we recently noted, lack of a causal nexus between a difficult personal life and the murders lessens the effect of this mitigation.  *State v. Garza*, 216 Ariz. 56, 73 ¶ 84, 163 P.3d 1006, 1023 (2007). Additionally, we weigh mental health mitigation in proportion to "a defendant's ability to conform or appreciate the wrongfulness of his conduct." *Johnson*, 212 Ariz. at 440 ¶ 65, 133 P.3d at 750 (quoting *State v. Trostle*, 191 Ariz. 4, 21, 951 P.2d 869, 886 (1997)).

**¶95**       In this case, no expert testified that Boggs did not know right from wrong, and none could establish his mental state at the time of the crime.  Without a causal link between the murders and his troubled childhood or mental health issues, these mitigating circumstances are entitled to less weight.  *See id.*  Weighed against three aggravating factors, including one for multiple homicides, the mitigating evidence is not sufficiently substantial to call for leniency.

**IV.**

¶96     For purposes of federal review, Boggs raises the following challenges to the constitutionality of Arizona's death penalty scheme.  He concedes that we have previously rejected these arguments.

¶97     (1) The fact-finder in capital cases must be able to consider all relevant mitigating evidence in deciding whether to give the death penalty.  *See Woodson v. North Carolina*, 428 U.S. 280, 304 (1976).  The trial court's failure to allow the jury to consider and give effect to all mitigating evidence in this case by limiting its consideration to that proven by a preponderance of the evidence is unconstitutional under the Eighth and Fourteenth Amendments.  We rejected this argument in *McGill*, 213 Ariz. at 161 ¶ 59, 140 P.3d at 944.

¶98     (2) The State's failure to allege an element of a charged offense in the grand jury indictment — the aggravating factors that made the defendant death eligible — is a fundamental defect that renders the indictment constitutionally defective under the Fifth, Sixth, Eighth, and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution.  *See United States v. Chesney*, 10 F.3d 641, 643 (9th Cir. 1993); *see also Apprendi v. New Jersey*, 530 U.S. 466 (2000).  We rejected this argument in *McKaney v.*

46

*Foreman ex rel. County of Maricopa*, 209 Ariz. 268, 273 ¶ 23, 100 P.3d 18, 23 (2004).

**¶99** (3) Both the United States and the Arizona Constitutions prohibit *ex post facto* laws. U.S. Const. Art. 1, § 10, cl. 1; Ariz. Const. art. 2, § 25. Application of the new death penalty law to defendant constitutes an impermissible *ex post facto* application of a new law. We rejected this argument in *State v. Ring*, 204 Ariz. 534, 547 ¶¶ 23-24, 65 P.3d 915, 928 (2003).

**¶100** (4) The F.6 aggravating factor of "especially cruel, heinous, or depraved" is unconstitutionally vague and overbroad because the jury does not have enough experience or guidance to determine when the aggravator is met. The finding of this aggravator by a jury violates the Eighth and Fourteenth Amendments because it does not sufficiently place limits on the discretion of the sentencing body, the jury, which has no "narrowing construction[s]" to draw from and give "substance" to the otherwise facially vague law. *See Walton v. Arizona*, 497 U.S. 639, 652-54 (1990), *overruled on other grounds by Ring v. Arizona*, 536 U.S. 584 (2002); *Godfrey v. Georgia*, 446 U.S. 420, 428-29 (1980). We rejected this argument in *State v. Cromwell*, 211 Ariz. 181, 188-90 ¶¶ 39-45, 119 P.3d 448, 455-57 (2005).

**¶101** (5) By allowing victim impact evidence at the penalty phase of the trial, the trial court violated defendant's

constitutional rights under the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 13, 15, 23, and 24 of the Arizona Constitution. We rejected challenges to the use of victim impact evidence in *Lynn v. Reinstein*, 205 Ariz. 186, 191 ¶ 16, 68 P.3d 412, 417 (2003).

¶102    (6) The trial court improperly omitted from the penalty phase jury instructions words to the effect that they may consider mercy or sympathy in deciding the value to assign the mitigation evidence, instead telling them to assign whatever value the jury deemed appropriate. The court also instructed the jury that they "must not be influenced by mere sympathy or by prejudice in determining these facts." These instructions limited the mitigation the jury could consider in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments and Article 2, Sections 1, 4, 15, 23, and 24 of the Arizona Constitution. We rejected this argument in *State v. Carreon*, 210 Ariz. 54, 70-71 ¶¶ 81-87, 107 P.3d 900, 916-917 (2005).

¶103    (7) The death penalty is cruel and unusual under any circumstances and violates the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *State v. Harrod*, 200 Ariz. 309, 320 ¶ 59, 26 P.3d 492, 503 (2001), *vacated on other grounds*, 536 U.S. 953 (2002).

48

¶104     (8) The death penalty is irrational and arbitrarily imposed; it serves no purpose that is not adequately addressed by life in prison, in violation of the defendant's right to due process under the Fourteenth Amendment to the United States Constitution and Article 2, Sections 1 and 4 of the Arizona Constitution.  We rejected these arguments in *State v. Beaty*, 158 Ariz. 232, 247, 762 P.2d 519, 534 (1988).

¶105     (9) The prosecutor's discretion to seek the death penalty lacks standards and therefore violates the Eighth and Fourteenth Amendments, and Article 2, Sections 1, 4, and 15 of the Arizona Constitution.  We rejected this argument in *State v. Sansing*, 200 Ariz. 347, 361 ¶ 46, 26 P.3d 1118, 1132 (2001), *vacated on other grounds*, 536 U.S. 954 (2002).

¶106     (10) Arizona's death penalty is applied so as to discriminate against poor, young, and male defendants in violation of Article 2, Sections 1, 4, and 13 of the Arizona Constitution.  We rejected this argument in *Sansing*, 200 Ariz. at 361 ¶ 46, 26 P.3d at 1132.

¶107     (11) Proportionality review serves to identify which cases are above the "norm" of first-degree murder, thus narrowing the class of defendants who are eligible for the death penalty.  The absence of proportionality review of death sentences by Arizona courts denies capital defendants due process of law and equal protection and amounts to cruel and

49

unusual punishment in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *Harrod*, 200 Ariz. at 320 ¶ 65, 26 P.3d at 503.

¶108 (12) Arizona's capital sentencing scheme is unconstitutional because it does not require the state to prove the death penalty is appropriate or require the jury to find beyond a reasonable doubt that the aggravating circumstances outweigh the accumulated mitigating circumstances. Instead, Arizona's death penalty statute requires defendants to prove their lives should be spared, in violation of the Fifth, Eighth, and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution. We rejected this argument in *Pandeli*, 200 Ariz. at 382 ¶ 92, 26 P.3d at 1153.

¶109 (13) Arizona's death penalty scheme does not sufficiently channel the sentencing jury's discretion. Aggravating circumstances should narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a harsher penalty. Section 13-703.01 is unconstitutional because it provides no objective standards to guide the jury in weighing the aggravating and mitigating circumstances. The broad scope of Arizona's aggravating factors encompasses nearly anyone involved in a murder, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15

50

of the Arizona Constitution.  We rejected this argument in *Pandeli*, 200 Ariz. at 382 ¶ 90, 26 P.3d at 1153.

¶110    (14) Execution by lethal injection is cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.  We rejected this argument in *Van Adams*, 194 Ariz. at 422 ¶ 55, 984 P.2d at 30.

¶111    (15) Arizona's death penalty unconstitutionally requires imposition of the death penalty whenever at least one aggravating circumstance and no mitigating circumstances exist, in violation of the Eighth and Fourteenth Amendments, and Article 2, Section 15 of the Arizona Constitution.  Arizona's death penalty law cannot constitutionally presume that death is the appropriate default sentence.  We rejected this argument in *State v. Miles*, 186 Ariz. 10, 19, 918 P.2d 1028, 1037 (1996).

**V.**

¶112    For the foregoing reasons, we affirm Boggs' convictions and sentences.

_____
Ruth V. McGregor, Chief Justice

CONCURRING:

_____
Rebecca White Berch, Vice Chief Justice

51

_____
Michael D. Ryan, Justice


_____
Andrew D. Hurwitz, Justice


_____
W. Scott Bales, Justice